## THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICK RUSSELL, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,<br>21833 Kentucky Court<br>Clinton Township, MI 48035<br><div align="right">Plaintiff,</div><br>vs.<br><br>HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, ANN MCLAUGHLIN KOROLOGOS, SIDNEY HARMAN, SHIRLEY MOUNT HUFSTEDLER, EDWARD H. MEYER, KEVIN BROWN, SANDRA B. ROBINSON,  SANDRA S. BUCHANAN, and UNKNOWN FIDUCIARY DEFENDANTS 1-50<br>1101 Pennsylvania Avenue, N.W., Suite 1010 Washington, D.C. 20004<br><div align="right">Defendants.</div> | **Civil Action:** |

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
## INCOME SECURITY ACT ("ERISA")

Plaintiff, a participant in the Harman International Industries, Incorporated Retirement Savings Plan (the "Plan") covering substantially all employees of Harman International Industries, Incorporated and its subsidiaries (collectively "Harman" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), alleges as follows:

### INTROUCTION

1.      This is a class action brought pursuant to § 502 of ERISA, 29 U.S.C. § 1132, against the Plan's fiduciaries, including Harman, on behalf of Participants in and beneficiaries of the Plan.

2.     Throughout the Class Period (April 26, 2007 and the present), the Plan invested in Harman common stock ("Harman Stock" or "Company Stock"), which was offered as one of the investment alternatives in the Participant Contribution Component of the Plan.

3.     Plaintiff's claims arise from the failure of Defendants, who are Plan fiduciaries, to act solely in the interest of the Participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

4.     Specifically, Plaintiff alleges in Count I that Defendants breached their fiduciary duties to Plaintiff in violation of ERISA by failing to prudently and loyally manage the Plan's investment in Harman Stock by continuing to offer Company Stock as an investment option, and to make contributions in Company Stock, instead of suitable short-term options within the Plan, when the stock no longer was a prudent investment for Participants' retirement savings.  In Count II, Plaintiff alleges that Defendants who communicated with Participants regarding the Plan's assets, or had a duty to do so, failed to provide Participants with complete and accurate information regarding Harman Stock sufficient to advise Participants of the true risks of investing their retirement savings in Company Stock.  In Count III, Plaintiff alleges that Defendants, responsible for the selection, removal, and, thus, monitoring of the Plan's fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate.  In Count IV, Plaintiff alleges that Defendants breached their duties and responsibilities to avoid conflicts of interest and serve the interests of the Participants in and beneficiaries of the Plan with undivided loyalty.  In Count V, Plaintiff alleges that Defendants breached their duties and responsibilities as co-fiduciaries in the

manner and to the extent set forth in the Count. Finally, in Count VI, Plaintiff states a claim against Harman for knowing participation in the fiduciary breaches alleged herein.

5.      This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

6.      As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

7.      Because Plaintiff's claims apply to the Participants and beneficiaries as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants and beneficiaries of the Plan during the Class Period. Plaintiff also brings this action as a participant seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plan.

8.      In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and

appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

9.    *Subject Matter Jurisdiction.*  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

10.    *Personal Jurisdiction.*  ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the District of Columbia.

11.    *Venue.*  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

### Plaintiff

12.    *Plaintiff Patrick Russell* is a resident of Macomb County, Michigan.  Plaintiff is a former Harman employee and is a participant in the Plan.

**Defendants**

13.    ***Defendant Harman*** develops, manufactures and markets high fidelity audio products and electronic systems.  The Company develops, both internally and through a series of strategic acquisitions, a broad range of product offerings sold under renowned brand names.

14.    Throughout the Class Period, Harman's responsibilities included, along with its officers, directors and executives, broad oversight of and ultimate decision-making authority respecting the management and administration of the Plan and the Plan's assets, as well as the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility. Throughout the Class Period, the Company exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

15.    ***Defendant Harman Board of Directors***.   The Directors who served on the Harman Board of Directors (the "Board") were fiduciaries, because they exercised decision-making authority regarding the appointment of Plan fiduciaries and the management of the Plan's assets throughout the Class Period.  Among other things, the Board determines the annual profit sharing contributions that are made under the Plan.  Moreover, Harman acted through the Board in carrying out its Plan-related fiduciary duties and responsibilities, and, thus, members of the Board were fiduciaries to the extent of their personal exercise of such responsibilities.

16.    The "Director Defendants" who served on the Board and acted as fiduciaries with respect to the Plan during the Class Period are as follows:

    (a)    ***Defendant Ann McLaughlin Korologos ("Korologos")*** has served as a

director of the Company since 1995. During the Class Period, Defendant Korologos was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

(b)    ***Defendant Sidney Harman ("Harman")*** has served as the executive Chairman of the Company since 2000 and served as Chairman of the Board and as a director of the Company since the Company's founding in 1980. Defendant Harman also served as the Company's Chief Executive Officer ("CEO") from January 1, 2007 to June 30, 2007. During the Class Period, Defendant Harman was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(c)    ***Defendant Shirley Mount Hufstedler  ("Hufstedler")*** has served as a director of the Company since 1986. During the Class Period, Defendant Hufstedler was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

(d)    ***Defendant Edward H. Meyer ("Meyer")*** has been a director of the Company since 1990.  During the Class Period, Defendant Meyer was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

### *Officer Defendants*

17.    ***Defendant Kevin Brown ("Brown")*** was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer.

18.    ***Defendant Sandra B. Robinson ("Robinson")*** was, at all relevant times, the Company's Vice President of Financial Operations and Chief Accounting Officer.  Defendant Robinson also exercised and sold a significant amount of Harman stock options during the Class Period.

19.    ***Defendant Sandra S. Buchanan  ("Buchanan")*** acted as a fiduciary with respect to the Plan at times during the Class Period.  Defendants Buchanan signed the 2007 Form 11-K as "Vice-President Compensation & Benefits".

20.    Unknown Fiduciary Defendants 1-50 are residents of the United States and are or were fiduciaries of the Plan during the Class Period.  These Defendants whose identities are currently unknown to Plaintiff, may include additional Harman employees.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between April 26, 2007 to the present (the "Class Period") and whose accounts included investments in Harman Stock.

22.     Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

23.     ***Numerosity.***  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, over ten thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

24.     ***Commonality.***  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether Defendants acted as fiduciaries;

(b)     Whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan, and the Plan's Participants and beneficiaries;

(c)     Whether Defendants violated ERISA;

(d)     Whether the Plan suffered a loss and, by extension, members of the Class

sustained a diminution in vested benefits, and

      (e)      What is the proper measure of loss to the Plan and subsequent allocation of vested benefits to the Plan's Participants.

25.      ***Typicality.***  Plaintiff's claims are typical of the claims of the members of the Class because the Plan, the Plaintiff and the other members of the Class, each sustained a diminution in vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

26.      ***Adequacy.***  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

27.      Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

28.      Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plan and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate

over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLAN

### The Plan

29.    The Plan is an "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

30.    The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

31.    In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a defendant. Rather, Plaintiff request relief for the benefit of the Plan and for the benefit of its Participants.

32.    The Plan is a "defined contribution plan" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participants' account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

33.    The Plan is a voluntary contribution Plan whereby Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to Participants' individual accounts.

34.    In the Company's most recent filed Form 11-K, dated June 28, 2007, the Plan is

described as the following:

### (a)  General

The Plan is a defined contribution savings and profit-sharing plan
sponsored by the Company.  The Plan covers all eligible
employees, as defined by the Plan, provided they have completed
six months of consecutive service and have worked 500 hours.
The Plan is subject to the provisions of the Employee Retirement
Income Security Act of 1974 (ERISA).

### (b)  Contributions

Participants in the Plan may contribute on a tax-deferred basis
from 1% to 50% of their compensation, as defined by the Plan.
Participants may change their deferral percentage as of the first
payroll period following receipt of notice to the Plan
Administrator.  The Company has made annual basic contributions
equal to 3% of the compensation paid to all eligible participants,
and a matching contribution equal to 50% of the eligible
participant's tax-deferred contribution percentage for each payroll
period up to a maximum election of 6% per payroll period.  In
addition, the Company may make discretionary profit-sharing
contributions to the Plan in an amount determined by the
Company's board of directors.  For the years ended December 31,
2006 and 2005, the Board of Directors approved a profit-sharing
contribution of 2.5% of each eligible participant's compensation.

### (c)  Participant Account Balances

Separate accounts are maintained for each participant's salary
deferral, rollover, employer profit sharing, basic, and matching
contribution balances.  Earnings or losses of the Plan are allocated
to participant account balances by investment fund on a daily basis
according to the number of shares in the participant account
balances.  Company profit-sharing and basic contributions are
allocated based on participant compensation. Company matching
contributions are allocated based upon each participant's tax-
deferred contribution percentage.

### (d)  Vesting

Participants are 100% vested in their salary deferral contribution,
employer's basic contribution, and rollover contribution accounts,
and become vested in profit-sharing and matching contributions at
the rate of 25% per year after the completion of two years of
service, or 100% after reaching age 65, death, or disability.

### (e)  Investment Options

Plan participants direct contributions in any increment in any of the
investment options.  The options consist of the Company's

common stock, the Putnam Stable Value Fund, the Putnam S&P 500 Index Fund, the Putnam Money Market Fund, and 13 mutual funds.

### (f)  *Benefits*

On separation from service or termination of service due to death, disability or retirement, a participant may elect to receive an amount equal to the value of the participant's vested interest in his or her account in a lump-sum distribution.

## Plan Fiduciaries

35.    *Named Fiduciaries*.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

36.    *De Facto Fiduciaries*.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

37.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing Plan documents, through their conduct, and under ERISA.

38.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan -- and the Plan's investments -- solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

39.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

<div align="center">

**HARMAN STOCK WAS AN
IMPRUDENT INVESTMENT FOR THE PLAN**

</div>

40.    On April 26, 2007, the Company issued a press release entitled "Harman International Industries To Be Acquired By KKR And GS Capital Partners." Therein, the Company stated in relevant part:

<div align="center">

**Harman Stockholders Can Elect to Receive $120 Per Share In
Cash or Shares in Post-Transaction Company**

**Transaction Valued at Approximately $8 Billion**

</div>

Harman International Industries, Inc. (NYSE: HAR) today announced that it has entered into an agreement to be acquired by affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners ("GSCP") [the "Purchasing Companies"] in a transaction valued at approximately $8 billion. The transaction was unanimously approved by the Harman Board of Directors, following the recommendation of a Special Committee of independent directors. KKR initiated discussions with Harman and structured the transaction so that current Harman stockholders have the opportunity to participate in the future upside potential of the enterprise. The company will continue to be named Harman

International Industries and Dr. Sidney Harman, Founder and Executive Chairman, will remain Executive Chairman.

\*    \*    \*

Under the terms of the agreement, Harman stockholders will be entitled to receive $120 in cash for each share of Harman common stock they hold. As an alternative to receiving the cash consideration, Harman's stockholders will be offered the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman stock for shares in the new corporation incorporated by KKR and GSCP in order to acquire Harman. The total amount of Harman shares that may elect to receive shares in the post-transaction corporation is approximately 8.3 million, which would represent $1.0 billion (at the $120 per share transaction value) and an approximate 27% equity stake in Harman following the transaction. If elections for post-transaction shares exceed the $1.0 billion cap, post-transaction shares will be allocated to electing stockholders on a pro-rated basis, and the remaining Harman shares will be exchanged for cash. The election process will be fully detailed in the proxy statement/prospectus that will be mailed to Harman stockholders.

Dr. Harman, who owns approximately 5% of the outstanding common stock of Harman, will participate in the same election process available to all stockholders. He has committed that he will elect to exchange half of his current holdings for post-transaction shares, subject to the same pro ration that- applies to all stockholders as described above.

\*    \*    \*

Completion of the transaction, which is expected to occur in the third quarter of 2007, is subject to the approval of Harman stockholders, customary closing conditions and regulatory approvals. The Board of Directors of Harman has unanimously recommended that Harman stockholders vote in favor of the transaction.

41.    In commenting on the merger agreement with the Purchasing Companies in the same press release, defendant Harman stated, in relevant part, that:

> We are pleased to reach an agreement with KKR and GSCP that is in the best interest of our stockholders, presenting them with excellent value for their shares and the opportunity to participate in Harman's future growth. KKR and GSCP are two of the world's leading private equity investors and our Board of Directors strongly believes that this transaction will create attractive long term opportunities for our employees, customers and business partners. Together, we will continue to execute our strategic plan, capitalize on new opportunities, and build on our history of product innovation and service excellence.

42.     On the same day, the Company held a conference call to discuss its third quarter

2007 results.  During the conference call, defendant Harman stated in relevant part:

> First, a comment on the agreement we announced this morning, which merges Harman International into a new company to be financed by Kohlberg Kravis Roberts and Goldman Sachs.  The new Company will carry the Harman International name.  I will be its Executive Chairman and a substantial investor.  We think very well of the deal.
>
> It has been structured to provide shareholders with a substantial premium for their shares and, if they elect so, to retain a substantial portion of their investment in the Company going forward.  The deal rewards our loyal shareholders, a substantial number of whom have been owners for many years, and it recognizes the dedication, hard work, and commitment of our people.  Until we have moved the transaction through the SEC and other legal processes, we are constrained in what we can say.  However, a few highlights may be helpful.
>
> \*        \*        \*
>
> We begin the fourth quarter of the year and we look to fiscal '08 with a backlog of $14 billion.  We continue to expect fiscal '08 Automotive OEM revenues at $2.8 billion and EPS of $5.25, subject to the probability that we will not be able to absorb the $46 million engineering bulge I identified in our previous earnings call.  Let me remind that the bulge is driven by work on $1.1 billion of new business unanticipated when we first planned fiscal '08, and by continuing new work on Driver Assist.  If we are unable to absorb the $46 million R&D bulge, the projected fiscal '08 EPS would become $4.79.
>
> We have not received a major new award since our last earnings call, but there is a flow of good awards that add extra fiber to the backlog.  Land Rover has committed its branded audio business to Harman Kardon for the period fiscal 2011 through 2015.  The estimated annual revenue is $50 million, with total value of $250 million.  This is business that we had coveted, but now has been formally awarded.
>
> Permit me to offer a perspective going forward.  ***Ours is a very healthy business, as we have a special place in both the automotive OEM and the professional sides of our work.***  But we have no conceit that this is a walk in the park.  There are challenges as there are opportunities throughout the markets and throughout the technologies with which we work.  Those opportunities include geographic expansion in Asia, and especially in China.  They include a further expansion of Infotainment through midrange and entry-level automobiles.  And they include the promising and challenging new arena of Driver Assist.  We are

hard at work in all three areas. *We have made consequential progress in scaling our systems through the midrange and entry-level, and we are confident that our competitive and comparative advantage on the Infotainment side will serve us very well on the Driver Assist side.*

<p style="text-align:center">*       *       *</p>

As I look forward to our future in OEM, I see an interesting assembly of opportunity and challenge. I have already spoken about market opportunity. *Here, I recognize and emphasize that recognition, that our growth has been accompanied by variances in efficiency. We are determined to rationalize our engineering and to reduce significantly the percentage of sales that R&D represents. I have spoken about this before. I mention it now not because I have some major new insight, but precisely to emphasize the fact that it is before us that we have our work cut out, but we intend to get it done.*

(Emphasis added).

43.     In addition, in answering a question from an analyst, defendant Harman made the following remarks regarding the Company's R&D expenses:

> **JEFF KESSLER**: I guess the question that we have is around continuing to match R&D to the revenue structure, as you see it, given that you have programs in place that are obviously important and obviously have a lot of potential. But getting your hands around the expense levels relative to new programs, are there some – you've mentioned one or two that are in line to produce over the next several years. *Is there anything that we should be aware of which is maybe going to change that R&D-to-revenue percentage, let's say, 18 months out or so?*
>
> **SIDNEY HARMAN**: Are you asking whether the percentage of revenue represented by R&D will increase or decrease?
>
> **JEFF KESSLER**: I'm asking, again, how are you going to get that decrease? In other words, where is the return on that R&D going to come from?
>
> **SIDNEY HARMAN**: I've got it. In two ways, really. *Understand first that the increase is, from our point of view, a very constructive thing.* The so-called bulge was generated by the receipt of awards that we did not contemplate when we were generating the plan and generating our guidance. The engineering represented in that bulge is essentially for the new BMW award and the development of Driver Assist, which we believe has very positive implications down the road. I have not yet answered your question, but I thought it useful to set that base.
>
> Now we believe -- and I have made this clear numbers of times -- we believe that in the growth of the Company and in the urgency

of getting the job done in what was a substantially new world of technology, the primary objective was just that -- get it done and, in effect, damn the cost. We are still in that surge mood. I should be careful about the use of that word, I suppose. *But I am convinced, Kevin is convinced, our Board is convinced that over time -- and reasonable time -- we can rationalize that engineering so that as a percentage of sales -- and remind you sales will be going up, so that if the engineering expense staved fixed, the percentage would decline so it moves us constructively in that direction -- but we believe that we can rationalize, generate efficiencies such as to permit us to improve that percentage by approximately 100 basis points a year over the next several years.*

(Emphasis added).

44.    During the same conference call, defendant Brown stated, in part, the following:

Total Harman International R&D expenses in the third quarter were $90 million, or 10.2% of sales, compared to $74 million, or 9.2% of sales, in the same quarter of the prior year. As Sidney discussed, R&D is trending higher than we had anticipated as we work to develop new technologies and new programs. We expect fiscal 2007 R&D expenses to approximate 10% of full-year sales. *In fiscal 2008, we anticipate R&D will begin to decrease as a percentage of sales.* The increase in R&D explains $16 million of the $20 million increase in SG&A in the third quarter compared to the prior year. Despite the increase in R&D, total SG&A as a percent of sales remained relatively flat at 23% of sales in the quarter.

(Emphasis added).

45.    On April 27, 2007, the Company filed a Form 8-K with the SEC providing additional guidance on the merger with the Purchasing Companies. The Form 8-K was signed by defendant Robinson and stated, in relevant part, the following:

On April 26, 2007, Harman International Industries, Incorporated, a Delaware corporation (the "Company"), entered into an Agreement and Plan of Merger (the "Merger Agreement") with KHI Parent Inc., a Delaware corporation ("Parent"), and KHI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Merger Sub").

The Merger Agreement provides for the merger of Merger Sub with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Parent. Merger Sub and Parent are affiliates of Kohlberg Kravis Roberts & Co., L.P. ("KKR") and GS Capital Partners ("GSCP", and together with KKR, the "Sponsors) formed by the Sponsors in order to acquire the Company.

\*    \*    \*

The Board of Directors of the Company has unanimously determined that the Merger is in the best interests of the Company and its stockholders, and declared advisable, to enter into the Merger Agreement, approved the Merger Agreement and resolved to recommend adoption of the Merger Agreement by Company stockholders.

\*    \*    \*

The closing of the Merger is subject to customary closing conditions, including adoption of the Merger Agreement by the Company's stockholders and antitrust clearance.  Closing is not subject to any financing condition but the closing may be delayed in certain circumstances to facilitate financing.  The Merger is expected to be completed in the third calendar quarter of 2007.

\*    \*    \*

The Company has made customary representations and warranties in the Merger Agreement and agreed to customary covenants, including covenants regarding operation of the business of the Company and its subsidiaries prior to the closing.

\*    \*    \*

The Merger Agreement has been included to provide investors and security holders with information regarding its terms.  It is not intended to provide any other factual information about the Company, Parent, or their respective subsidiaries and affiliates. The Merger Agreement contains representations and warranties by the Company, on the one hand, and by Parent and Merger Sub, on the other hand, made solely for the benefit of the other.  The assertions embodied in those representations and warranties are qualified by information in confidential disclosure schedules that the parties have exchanged in connection with signing the Merger Agreement.  The disclosure letter delivered to Parent in connection with the Merger Agreement contain information that modifies, qualifies and creates exceptions to the representations and warranties set forth in the Merger Agreement.  Moreover, certain representations and warranties in the Merger Agreement were made as of a specified date, may be subject to a contractual standard of materiality different from what might be viewed as material to stockholders, or may have been used for the purpose of allocating risk between the Company, on the one hand, and Parent and Merger Sub, on the other hand.  Accordingly, the representations and warranties in the Merger Agreement should not be relied on by any persons as characterizations of the actual state of facts about the Company, Parent or Merger Sub at the time they were made or otherwise.

46.      On August 24, 2007, the Company held a conference call to discuss its fourth

quarter 2007 financial results.  During the conference call, defendant Harman stated, in part, the

following:

> *Our dominance in the automotive space was solidified through the past year where we had earlier confronted doubt about our ability to move effectively beyond the luxury car market for our infotainment systems.  That doubt has been erased.  With earlier awards to us from PSA, Audi and Chrysler, we established our leadership in the mid-range and entry levels with last year's major awards from UMW, we erased any remaining questions. We are moving from an era in which each new infotainment system represented a virtually original effort with all new R&D to a new era in which the major automotive makers are committing to a common electronics platform, applicable across the full range of car lines.*  That growing set of decisions represents a dramatic shift from the traditional emphasis by automakers on multiple suppliers, to a readiness to commit across the board to a single supplier.  That dramatic decision is driven overwhelmingly by new technology, and by the advantages in cost and performance available from a common scalable electronics platform.
>
> Moving into fiscal 2008, our position is further enhanced by our developing technology partnership with Intel and the exclusive opportunity it provides us to employ Intel's powerful new mobile processor in our new designs.  Implicit in that application is greater speed, significant improvement in graphic realization, and impressively useful extension of our functionality.  We believe that we are in a unique position to move quickly and impressively to build our order book for the second decade of the 21st century.

(Emphasis added).

47.     During the same conference call, Dinesh Paliwal, the Company's Chief Executive

Officer and President, stated, in part, the following:

> During the past few weeks, I visited several key Harman business locations, and met with several hundred employees in Europe and North America.  Although it is still relatively early to form opinions, several positive aspects of this company, which were the basis of my decision to join Harman, have been validated.  *I'm excited -- actually, I'm excited about the opportunities in the premium automotive and professional sectors of our business. I'm equally excited about the growth rates and the growing market size of the midmarket segments in the developed world, and emerging markets in Eastern Europe and so-called BRIC -- Brazil, Russia, India, and China countries.*
>
> Harman is a potent global brand and I'm determined to penetrate these markets.  I feel pretty strongly about it.  *Our product*

> *portfolio is robust and our R&D in close collaboration with leading customers will keep us ahead of competition.* Converting these opportunities into profitable business will require a strong management team and peer accountability at all levels.

(Emphasis added).

48.     On August 29, 2007, the Company filed its year end 10-K with the SEC.  The

Form 10- K was signed by defendants Harman, Brown, and Robinson and stated, in relevant

part, the following:

> On April 26, 2007, we entered into an Agreement and Plan of Merger with KHI Parent Inc., a company formed by investment funds affiliated with KKR and GSCP.  The merger agreement provides for the merger of KHI Merger Sub Inc. with and into our company, with our company surviving the merger as a wholly owned subsidiary of Parent. KHI Merger Sub and Parent were formed to acquire our company.
>
> If the merger agreement is adopted by our stockholders and the merger is completed, our stockholders will be entitled to receive $120.00 in cash, without interest, for each share of Harman common stock owned at the completion of the merger.  As an alternative to receiving the $120.00 per share, our stockholders have the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman common stock, on a one-for-one basis, for shares of common stock of Parent.  The right to elect to receive shares of Parent common stock is available to all Harman stockholders and option holders.  However, the number of Parent shares our stockholders and option holders will receive may be less than they request in the event that elections to receive shares of Parent common stock would require Parent to issue more than 8,333,333 shares of Parent common stock.  This number of Parent shares represents approximately 27% of the equity interests in Parent that will be outstanding immediately following the merger based on the expected equity financing for the merger.  If the total elections for Parent shares exceed that maximum number, then the shares of Parent common stock will be allocated to electing Harman stockholders and option holders on a pro rata basis and the remaining Harman shares and options will be converted into cash.
>
> Our Board of Directors, upon the recommendation of a committee of independent directors, has unanimously approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, determined that the terms of the merger agreement are fair to, and in the best interests of, our company and our stockholders and resolved to recommend that our stockholders vote in favor of the adoption of the merger agreement.

Completion of the merger is subject to the approval of our stockholders and other customary closing conditions, including regulatory approvals and antitrust clearances. We presently anticipate that the merger will be completed in the fourth quarter of calendar year 2007.

\*       \*       \*

Selling, general and administrative ("SG&A") expenses as a percent of net sales were 23.2 percent in fiscal 2007 compared to 23.3 percent in the prior year. *Research and Development ("R&D") costs are the largest component of our SG&A expenses.* In fiscal 2007, R&D costs were $356.7 million or 10.0 percent of net sales. In fiscal 2006, R&D costs were $302.0 million, or 9.3 percent of net sales. *The increase was primarily due to cost incurred to support new infotainment system awards from automotive customers. We expect R&D costs, as a percentage of net sales to decrease approximately 1 percentage point in fiscal 2008 due to the increasing scalability of our infotainment systems and the beginning of production for certain automotive programs.* SG&A expenses also include employee compensation and benefit costs. We have recorded stock-based compensation expense under the fair value based method since fiscal 2003, including $15.4 million, $16.6 million and $14.3 million in fiscal 2007, 2006 and 2005, respectively.

\*       \*       \*

Automotive -- Automotive R&D costs were $286.5 million in fiscal 2007, representing 11.5 percent of net sales. Fiscal 2006 R&D costs were $232.2 million, or 10.4 percent of net sales. *These costs were incurred to develop audio, electronic and infotainment systems for an expanding list of automotive platforms. Our infotainment systems are increasingly based on scalable software allowing us to efficiently design systems for luxury, mid-range and entry-level vehicles.* During fiscal 2007, we received a major infotainment systems award from BMW that will encompass virtually their entire model range. This sophisticated system will include HD and satellite radio capabilities, second and third dimensional navigation, traffic information, voice recognition, Internet browser and wireless connectivity. We also develop various systems for Mercedes-Benz, Audi, PSA Peugeot Citroen and Porsche in Europe. In the United States and Asia, we develop audio systems for Toyota, Lexus, Hyundai, Chrysler and Harley-Davidson. Automotive SG&A expenses also include restructuring costs of $5.7 million in fiscal 2007 and $7.3 million in fiscal 2006.

(Emphasis added).

49.     In addition to being signed by defendants Harman, Brown, and Robinson, the

Company's Form 10-K was also certified pursuant to Section 302 of the Sarbanes-Oxley Act of

2002 by defendant Harman.

## THE TRUTH BEGINS TO EMERGE

50.    On September 21, 2007, the Company issued a press release entitled "Harman Comments On Previously Announced Merger." The press release stated, in part, the following:

> Harman International Industries, Incorporated (NYSE: HAR) announced that it was informed this afternoon that Kohlberg Kravis Roberts & Co. L.P. (KKR) and GS Capital Partners VI Fund, L.P. (GSCP) *no longer intend to complete the previously announced acquisition of Harman by a company formed by investment funds affiliated with or sponsored by KKR and GSCP. KKR and GSCP have informed Harman that they believe that a material adverse change in Harman's business has occurred. That Harman has breached the merger agreement and that they are not obligated to complete the merger.* Harman disagrees that a material adverse change has occurred or that it has breached the merger agreement.

(Emphasis added).

51.    On this news, shares of the Company's stock fell from an opening price of $97.70 on September 21, 2007 to close at $85.00 the same day. Thus, the Company's share price fell more than 12 percent.

52.    On the same day, an article published by *Reuters* stated, in part, the following regarding the failed merger between Harman and the Purchasing Companies:

> Kohlberg Kravis Roberts & Co LP and Goldman Sachs Group Inc.'s (GS.N: Quote, Profile, Research) private equity arm are worried about certain financial conditions inside Harman International Industries Inc (HAR.N: Quote, Profile, Research), concerns that could threaten the $8 billion deal, a source said on Friday.
>
> *The concerns stemmed less from broad credit market worries and more from internal conditions within the company said the source, who is familiar with the matter but did not want to be identified*.

(Emphasis added).

53.    On the same day, *Reuters* issued another press release stating, in part, that:

> *Trade in shares of audio equipment maker Harman International Inc (HAR.N: Quote, Profile, Research) was suspended on Friday, pending news from the company*.
>
> The company is the target of an $8 billion takeover, but a source familiar with the matter said the buyers are worried about the company's financial conditions.

(Emphasis added).

54.     Later on the same day, *Reuters* issued yet another article regarding the merger and, this time, gave additional details regarding the pullout.   The article states, in part, the following:

> NEW YORK (Reuters) -- Harman International Industries Inc. (NYSE: HAR -- News) said its private equity buyers are pulling out of their $8 billion buyout deal, a severe blow to the company whose shares fell more than 25 percent on Friday.
>
> <p style="text-align:center">*       *       *</p>
>
> *But the Harman bail-out looks centered on the financial conditions of the company itself, not the lending agreement, and marks the first time in a two-year private equity acquisition frenzy that buyers walked out of a major deal.*
>
> *Merger arbitrage traders and an analyst said among the hurdles Harman faced was rising inventories and declining cash flows and sales in the last few quarters.  Traders also said questions surfaced recently about Harman's relationship with Daimler-Chrysler, a customer for its audio products.*
>
> <p style="text-align:center">*       *       *</p>
>
> One analyst said Haman's inventories in February were up 40 percent, while second-half sales expectations were for an 11 percent rise.
>
> "When you've got inventories going through the roof, cash flows are going to get hit," said Aka Guyer Galperin, an analyst covering Harman at independent research firm RiskMetric Group.
>
> The merger proxy does have language in it on pertaining the deal being threatened in the event of certain "material adverse" effects on Harman.
>
> *"The company either has to slow production, reduce prices.  Or have inventories remain at elevated levels and that deteriorates your cash flow model,"* Galperin said, adding that personal navigation devices for cars were among the items sitting in the inventory.
>
> *Traders said on Friday that a great deal of attention was being paid to a filing showing that sales to DaimlerChrysler accounted*

> *for 25 percent of Harman's total consolidated net sales for the fiscal year ended June 30, 2007. Cerberus Capital recently bought Chrysler from Daimler.*
>
> While Harman says in the filing that loss of sales to the customer would have a "material adverse effect" on sales, there is no public indication that the relationship is in jeopardy.
>
> Harman founder Sidney Harman owned about 5 percent of the company's stock at the time of the deal and committed to exchange half of his holdings for stub equity.

(Emphasis added).

55.    Similarly, on the same day, a *Forbes* article stated, in part, the following regarding the failed merger:

> **KKR and Goldman Dump Harman**
>
> Harman, it's not us, it's you. This is what the audio-manufacturing firm claims it just heard from would-be buyers KKR and Goldman Sachs when they backed out a deal Friday to buy the firm. Harman then told the world the news, just slightly ahead of the closing bell at the New York Stock Exchange.
>
> <div align="center">*        *        *</div>
>
> Although the exact reason for the drawback is not known yet, Harman's fourth quarter and full year results did fall short of Wall Street's expectations. In the fourth quarter Wall Street expected earnings of $1.24 and Harman yielded 98 cents. Full year of fiscal 2007 Wall Street requested $4.38 and Harman yielded $4.14.
>
> *According to the Associated Press, one anonymous insider said the private equity firms sought to squash the deal over questions about Harman's financial health, not because of any financing difficulties in a tight credit market. The person said the effort to back out is sincere and not a negotiating tactic.*
>
> Prior to the release, the NYSE had contacted Harman regarding its price drop, and requested it release information pertaining to the drop.
>
> After the company declined the NYSE then released its own report that Harman had denied its request. Shortly after its denial, Harman changed course and told the NYSE it would make a press release. In accordance with regulation, the exchange halted the stock from trading.

(Emphasis added).

56.    Then, on September 24, 2007, the Company issued a press release entitled, "Harman Provides Guidance For Fiscal 2008." The press release stated, in part, the following:

*The Company expects fiscal 2008 performance to be impacted by a number of factors including increased R&D to support the development of several new infotainment platforms and associated launch costs. We now expect fiscal 2008 sales to reach $4.1 billion ($3.55 billion in 2007). The Company expects operating income and diluted EPS before merger related costs to equal or exceed last year's record performance.* In 2007, operating income was $397 million and diluted EPS were $4.14 adjusted for nonrecurring restructuring charges, merger costs and tax items.

*For the quarter ending September 30, 2007 we estimate net sales of $950 million, operating profit of $40 million and diluted EPS of $0.50 before merger-related costs. As previously disclosed, the fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards.* We expect substantial margin improvements over the course of fiscal 2008 as we work through these costs and begin the launching of new infotainment platforms.

"In light of increases in material costs and faster ramp-up of R&D resources to work on new business awards, equaling the record operating performance of fiscal 2007 is an achievement. The benefits of common platform synergy and scalability will be realized in fiscal 2009 and beyond. Those benefits will strengthen our operating profits," said Paliwal.

(Emphasis added).

57.    On this news, shares of the Company's stock fell to $80.31 on extremely high volume of over 14.5 million shares.

58.    Therefore, within two trading days, the Company's share price fell approximately $32 per share, or almost 30 percent, on extremely heavy trading volume.

59.    Thus, based on the foregoing, during the Class Period, defendants misrepresented and/or failed to disclose: (a) that the Company had breached the merger agreement with KKR and GSCP and therefore placed the Merger in serious doubt; (b) that the Company needed to sustain higher research and development ("R&D") costs primarily related to its automotive platform awards; (c) that the Company's inventory was greater than disclosed and was negatively impacting its cash flows; (d) that its relationship with Daimler-Chrysler had

materially worsened; (e) that a material adverse change in Harman's business had occurred which related to capital spending; (f) that the Company's financial health had generally deteriorated; and (g) that, as a result of the foregoing, the Company's statements about its financial well-being, earnings, and future prospects were lacking in a reasonable basis when made.

## ADDITONAL INFORMATION

60.     On September 25, 2007, *The Wall Street Journal* published an article entitled "Harman Blames Increased Expenses For Expected 1st-Quarter Earnings Miss."   The articles stated, in part, the following:

> Harman International Industries Inc., whose planned $8 billion buyout collapsed Friday, said its fiscal first-quarter earnings will fall below Wall Street's expectations amid increased research and development spending.
>
> The Washington company, which builds audio components for home stereos and automobiles, forecast earnings of 50 cents a share, before merger-related costs, for the quarter ending Sept. 30 and sales of $950 million.   The average estimate of analysts surveyed by Thomson Financial were for earnings, excluding items, of $1.02 a share on revenue of $934.4 million.
>
> Late Friday, Kohlberg Kravis Roberts & Co. and Goldman Sachs Group Inc.'s equity arm walked away from their planned $8 billion leveraged buyout of Harman, saying they found financial conditions inside the stereo maker to be unacceptable.
>
> The buyers also said Harman might have tripped certain covenants in the parties' merger agreement ***related to capital spending***, said one person familiar with the matter.
>
> "The fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards," said Harman Chief Executive Dinesh Paliwal.   "We expect substantial margin improvements over the course of fiscal 2008 as we work through these costs" and launch new products.

(Emphasis added).

**THE LAW UNDER ERISA**

61.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

62.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

63.     ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

64.     These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law." They entail, among other things:

       (a)     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this

instance the Plan, which invested in Harman Stock, to ensure that each investment is a suitable option for the Plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)    A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

65.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

66.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the

breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

67.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

68.    During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

69.    During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in Company Stock. Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and Plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

70.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSES OF ACTION

## COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)**

71.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

72.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

73.    As alleged above, Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company Stock.

74.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in Harman Stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

75.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it

allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

76.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's Participants and beneficiaries, from suffering losses as a result of the Plan's investment in Harman Stock.  Further, given that such a high concentration of the assets of the Plan was invested in the stock of a single company (Harman), Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments. All categories of Defendants failed to implement any such strategy.

77.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

78.    Defendants breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plan's assets with respect to offering Company Stock as an investment option in the Plan; enabling Defendants' failure to prudently manage the Plan's assets with respect to the Plan's investments; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

79.    Specifically, at least some of the Defendants had actual knowledge of Harman's corporate malfeasance and questionable reporting and business.  In addition, in light of their

high-ranking positions as high ranking officers at the Company, Director Defendants had/should have had constructive knowledge of these activities.

80.     Despite this knowledge, Defendants participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing Participants that the Plan's holdings of Harman Stock were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in Harman Stock, despite inarguably having knowledge of such breaches.

81.     Furthermore, through their own failure to prudently and loyally manage the Plan's investment in Harman Stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, Defendants named in this Count enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in Harman Stock.

82.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries (Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

83.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

84.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

85.    As alleged above, the scope of Defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to Participants regarding the Plan and assets of the Plan.  In addition, Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plan.

86.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan, this duty applies to all of the Plan's investment options, including investment in Harman Stock.

87.    Because a substantial percentage of the Plan's assets were invested in Harman Stock, and Defendants chose to invest overwhelmingly in Harman Stock, such investment carried with it an inherently high degree of risk.  This inherent risk made Defendants' duty to provide complete and accurate information particularly important with respect to Company Stock.

88.    Specifically, Harman, through its officers and directors issued a multitude of false and misleading statements through SEC filings and press releases regarding value of Harman Stock and the financial health of the Company.

89.    Upon information and belief, such communications were disseminated directly to all Participants, which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports furnished by Harman, through its officers and Director Defendants. In addition, upon information and belief, the Company communicated directly with all Participants regarding the merits of investing in Harman Stock in company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding Harman Stock as required by ERISA.

90.    In addition, Defendants were responsible for providing Participants in the Plan with investment education and communication.  Defendants, however, failed to disclose any information to Plan Participants regarding Harman's deceitful business practices and how these activities adversely affected Company stock as a prudent investment option under the Plan. Defendants thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plan.

91.    Defendants named in this Count breached their duty to inform Participants by failing to provide complete and accurate information regarding Harman Stock, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of Harman Stock and the prudence of investing retirement contributions in the Company's stock.

92.    These failures were particularly devastating to the Plan and the Participants, as a significant percentage of the Plan's assets were invested in Harman Stock during the Class Period and, thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets.

93.    In addition, Harman and the other Defendants named in this Count knew or should have known that information they possessed regarding the true condition of Harman would have an extreme impact on the Plan. Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

94.    As a consequence of the failure of Defendants named in this Count to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Harman Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, Harman Stock was an inherently unsuitable and inappropriate investment option for their Plan accounts. Had accurate information been provided, Participants could have protected themselves against losses accordingly, and consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

95.    As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If these Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary

duties alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

96.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

<div style="text-align:center">

**COUNT III**

**Failure to Monitor Appointed Plan Fiduciaries and Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Harman and the Board of Directors)**

</div>

97.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

98.    At all relevant times, as alleged above, Harman and the Director Defendants named in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  At all relevant times, as alleged above, the scope of the fiduciary responsibilities of Harman and the Director Defendants named in this Count included the responsibility to appoint, evaluate, and monitor other fiduciaries.  The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. The monitoring fiduciaries, Harman and the Director Defendants named in this Count, had the duty to:

(a)    Ensure that the appointed Plan fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, as noted above, and the behavior of the Plan's Participants;

(b)    Ensure that the appointed Plan fiduciaries are provided with adequate financial resources to do their job;

#768302v.1                                    - 36 -

(c)    Ensure that the appointed Plan fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)    Ensure that the appointed Plan fiduciaries have ready access to outside, impartial advisors when needed;

(e)    Ensure that the appointed Plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(f)    Ensure that the appointed Plan fiduciaries report regularly to the Company, the Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

99.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.    In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

100.    Harman and the Director Defendants named in this Count breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed Plan fiduciaries were given adequate information about the Company's business problems alleged above, which made Company Stock an imprudent investment, which was necessary for them to perform their duties of overseeing the Plan's investments, and (b) failing to ensure that the monitored

fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities.

101.   Harman and Director Defendants also breached this duty by not properly disclosing information, that they knew or should have known, about the Company's improper business practices to the Trustee.  The Trustee is responsible for investing and managing assets of the Plan.  However, in doing so, the Trustee shall be subject to the direction and guidance of Harman.

102.   Harman and the other Defendants named in this Count, knew or should have known that the fiduciaries they were responsible for monitoring were (a) imprudently allowing the Plan to continue offering Harman Stock as an investment alternative for the Plan, and (b) continuing to invest the assets of the Plan in Harman Stock when it no longer was prudent to do so.  Despite this knowledge, Harman and the Director Defendants named in this Count failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of these fiduciaries' failures.

103.   Harman and the Director Defendants named in this Count are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the appointed Plan fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

104.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

105.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C., § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of
### ERISA §§ 404 and 405 by All Defendants)

106.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

107.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

108.    ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

109.    Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company Stock, before the interests of the Plan and its Participants and beneficiaries.  These conflicts of interest put Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives (and Harman stockholders), and the interests of

the Plan's Participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

110.   Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Harman Stock; failing to notify appropriate federal agencies, including the SEC of the facts and transactions which made Harman Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Company Stock.

111.   Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

### Co-Fiduciary Liability
### (Breaches of Fiduciary Duties in Violation of ERISA § 405 by All Defendants)

112.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

113.   ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such

act or omission is a breach; (b) he fails to comply with § 1104(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

114.    As alleged herein, Harman, through its officers and employees withheld material information from the Plan's Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed to these Defendants as a matter of law.  In addition, as alleged herein on information and belief, Harman and the other Defendants named in this Count participated in and/or knew about the Company's misrepresentations regarding the Company's financial condition.  Thus, these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of Harman Stock as an investment for the Participants' retirement assets.

115.    Despite this knowledge, Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of Harman Stock during the Class Period. They did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in Harman Stock in the manner alleged herein in violation of ERISA § 405(a)(l)(A).  In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in Harman Stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

116.    In further violation of ERISA § 405(a)(l)(C), Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole.    Instead, they compounded the problem by downplaying the significance of Harman's problems and further concealing such practices from Participants and the market as a whole.

117.    In addition, Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendant -- including any appointed Plan fiduciaries -- who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's improper practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in Harman Stock.    In so doing, these Defendants breached ERISA § 405(a)(l)(B).

118.    Further, through their failure to properly and effectively monitor and remove those fiduciaries whose performance was inadequate as alleged above, Defendants named in this Count enabled these appointed Plan fiduciaries' imprudent management of the Harman Stock in the Plan.

119.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

120.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

### Knowing Participation in a Breach of Fiduciary Duty
### (Breaches of Fiduciary Duties in Violation of
### ERISA §§ 404 and 502(a)(3) by Harman)

121.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

122.    To the extent that Harman is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Harman knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

123.    Harman benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by contributing Harman Stock to the Plan while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of Harman providing the market with materially misleading statements and omissions.  Accordingly, Harman may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Harman Stock which would have been contributed to the Plan, but for Harman's participation in the foregoing breaches of fiduciary duty.

## CAUSATION

124.    The Plan suffered millions of dollars in losses in plan benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in Harman Stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

125.    Defendants are responsible for losses in Plan benefits caused by the Participants' direction of investment in Harman Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants concealed material, non-public facts from Participants, and provided inaccurate, incomplete and materially misleading information to them regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle.  As a consequence, Participants could not exercise independent control over their investments in Harman Stock, and Defendants remain liable under ERISA for losses caused by such investment.

126.    Defendants are also responsible for all losses in Plan benefits caused by the investment of the Plan's Company Contributions in Harman Stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

127.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Harman Stock, eliminating such Company Stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of Harman Stock when maintaining such an

investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

128.    Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiff relied to their detriment on the misstatements and omissions that Defendants made to Plan Participants.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

129.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Harman Stock during the Class Period.   As a consequence of Defendants' breaches, the Plan suffered significant losses.

130.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes Asuch other equitable or remedial relief as the court may deem appropriate . . . ."

131.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been, properly administered.

132.    Plaintiff and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

133.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## ERISA SECTION 404(c) DEFENSE INAPPLICABLE

134.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from Participants' exercise of control over investment decisions.  In order for § 404(c) to apply, Participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

135.    Those provisions were not complied with here as, among other reasons, instead of taking the necessary steps to ensure effective participant control by complete and accurate material information disclosure, Defendants did exactly the opposite.  As a consequence, Participants in the Plan did not have informed control over the portion of the Plan's assets that

were invested in Harman Stock as a result of their investment directions, and Defendants remained entirely responsible for losses that result from such investment.

136.    Because ERISA § 404(c) does not apply here, Defendants' liability to the Plan, the Plaintiff and the Class for relief stemming from Participants' decisions to invest contributions in Harman Stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

137.    Furthermore, under ERISA, fiduciaries -- not Participants -- exercise control over the selection of investment options made available to Participants.    Thus, whether or not Participants are provided with the ability to select among different investment options, and whether or not Participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected by the fiduciaries and presented as an option to Participants, and as a result of such action the Plan suffers a loss.  Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plan.

138.    Finally, Defendants remain liable for Plan losses that pertain to Harman Stock acquired by the Plan with employer contributions, as Participants did not exercise any control.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C.     An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.     An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Harman Stock;

G.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

H.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated:  December __, 2007

John B Isbister,. Bar No. 277418
Toyja E. Kelley, Bar No. 482977
**TYDINGS & ROSENBERG LLP**
100 East Pratt Street
Baltimore, MD 21202
(410) 752-9700 (telephone)
(410) 727-5460 (facsimile)
(jisbister@tydingslaw.com)
(tkelley@tydingslaw.com)

-and-

**GAINEY & McKENNA**
Thomas J. McKenna
295 Madison Avenue
New York, NY 10017
(212) 983-1300 (telephone)
(212) 983-0383 (facsimile)
tjmckenna@gaineyandmckenna.com

*Attorneys for Plaintiff*

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Patrick Russell, On behalf of himself and all others similarly situated, 21833 Kentucky Court Clinton Township, MI 48035 | Harman International Industries, Inc., et al. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF       Clinton, MI (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT       Washington, D.C. (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| John B. Isbister Toyja E. Kelley Tydings & Rosenberg LLP 100 E. Pratt Street, 26th Flr Baltimore, Maryland 21202 (410) 752-9700 | |

| II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY) | III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY! |
|---|---|

○ 1 U.S. Government Plaintiff

● 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ● 4 |
| Citizen of Another State | ● 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Medical Malpractice ☐ 365 Product Liability ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act **Social Security:** ☐ 861 HIA ((1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) **Other Statutes** ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. *(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)* | OR | ○ F. *Pro Se General Civil* | | |
|---|---|---|---|---|

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ◉ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☒ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Sec. 502 of ERISA, 29 U.S.C. Sec. 1132

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23   **DEMAND $** _____   Check YES only if demanded in complaint   **JURY DEMAND:** YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE 12/6/2007    SIGNATURE OF ATTORNEY OF RECORD

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.