## THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICK RUSSELL, On Behalf of Himself And All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, SIDNEY HARMAN, SANDRA S. BUCHANAN, KEVIN BROWN, GREGORY HENRY, CHET SIMON, JEFFREY CURTIS, ROBERT RYAN, THE HARMAN ADMINISTRATIVE COMMITTEE, THE HARMAN INVESTMENT COMMITTEE, THE HARMAN PENSION COMMITTEE, and UNKNOWN FIDUCIARY DEFENDANTS 1-10,<br><br>Defendants. | Civil Action: 1:07-CV-02212 |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
## INCOME SECURITY ACT ("ERISA")

Plaintiff, a participant in the Harman International Industries, Incorporated Retirement Savings Plan (the "Plan"), covering substantially all employees of Harman International Industries, Incorporated and its subsidiaries (collectively "Harman" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), alleges as follows:

## INTRUCTION

1.      This is a class action brought pursuant to § 502 of ERISA, 29 U.S.C. § 1132, against the Plan's fiduciaries, including Harman, on behalf of Participants in and beneficiaries of the Plan.

2.      Throughout the Class Period (April 26, 2007 and the present), the Plan invested in Harman common stock ("Harman Stock" or "Company Stock"), which was offered as one of the investment alternatives in the participant contribution component of the Plan.  The Plan permits

several types of investment styles, including: **Harman Stock Fund**, Asset Allocation Funds, Growth Funds, Blend Funds, Value Funds, and Capital Preservation Funds.

3.      Plaintiff's claims arise from the failure of Defendants, who are Plan fiduciaries, to act solely in the interest of Participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

4.      This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

5.      As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of retirement savings and anticipated retirement income of the Plan's Participants.   Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

6.      Because Plaintiff's claims apply to Participants and beneficiaries as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this action as a class action on behalf of all Participants and beneficiaries of the Plan during the Class Period.  Plaintiff also brings this action as a participant seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plan.

7.      In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's

allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

8.     All administrative remedies have been exhausted, or, in the alternative, such exhaustion is either not required, has been waived or is futile.

9.     The Plan contains two sections (Sections 6.9 and 6.10 of the Harman International Industries Incorporated Retirement Savings Plan (Amended and Restated Effective As of January 1, 2006) (the "Harman Savings Plan")) that pertain to administrative remedies. Sections 6.9 and 6.10 prescribe a procedure for filing a claim for benefits and give a method to appeal claims administratively for Participants who have been "denied a benefit." These are the only sections in the Plan that detail administrative appeals or remedies. They do not pertain to this case, as this is not an individual claim for benefits. Therefore, there was no administrative remedy that Plaintiff could have pursued prior to bringing this suit in federal court.

## JURISDICTION AND VENUE

10.     ***Subject Matter Jurisdiction.*** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

11.     ***Personal Jurisdiction***. ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All Defendants are residents of the United States,

and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the District of Columbia.

12.     ***Venue***.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

**PARTIES**

**Plaintiff**

13.     ***Plaintiff Patrick Russell*** is a resident of Macomb County, Michigan.  Plaintiff is a former Harman employee and is a participant in the Plan.  Plaintiff seeks relief on behalf of himself and the other Participants in the Plan in accordance with the recent Supreme Court decision in *LaRue v. DeWolff, Boberg*, 128 S. Ct. 1020 (2008).

**Defendants**

14.     ***Defendant Harman*** develops, manufactures and markets high fidelity audio products and electronic systems.  The Company develops, both internally and through a series of strategic acquisitions, a broad range of product offerings sold under renowned brand names.   As explained in more detail at ¶¶ 23-28 below, defendant Harman was a fiduciary of the Plan.

15.     ***Defendant Sidney Harman ("S. Harman")*** has served as the executive Chairman of the Company since 2000 and served as Chairman of the Board and as a director of the Company since the Company's founding in 1980.  Defendant S. Harman also served as the Company's Chief Executive Officer ("CEO") from January 1, 2007 to June 30, 2007.  Defendant S. Harman signed the Harman Savings Plan.  During the Class Period, defendant S. Harman was

a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the Plan and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets. Defendant S. Harman was also a fiduciary of the Plan because he signed fiduciary communications during the Class Period, including SEC filings that the Plan documents specifically incorporated by reference.

16.    Defendant S. Harman held more than 3.53 million shares of Harman common stock, and he also held an additional 1 million vested and unvested options for the Company's common stock.  In fiscal 2007 alone, defendant S. Harman was granted options worth $2.44 million, which immediately would have vested in the merger (as described below).  In total, defendant S. Harman and his affiliates and family stood to receive over $543 million in proceeds from sales of stock to the Purchasing Companies (as defined below) in the merger.

17.    In addition, defendant S. Harman also enjoyed a lucrative compensation package that was tied in large part to the Company's reported financial performance. According to the most recent Proxy Statement (DEF 14A), more than one-half of defendant S. Harman's compensation during the Class Period was received through awards from the Company's performance-based incentive plan (the "Incentive Plan").  Defendant S. Harman's compensation under the Incentive Plan was based on whether the Company achieved certain pre-established financial and other objectives such as return on stockholder equity.  Based upon the materially false reported quarterly and annual results in fiscal 2007, defendant S. Harman received cash and stock compensation of $5.35 million.

18.    ***Defendant Harman Administrative Committee ("Administrative Committee")***. The members of the Administrative Committee are plan fiduciaries and supervise the investment of the assets of the Plan, and make decisions concerning investment options available under the Plan.  The Administrative Committee is comprised of defendants Sandra S. Buchanan and Kevin L. Brown.

(a)    ***Defendant Sandra S. Buchanan  ("Buchanan")*** acted as a fiduciary with respect to the Plan at times during the Class Period.  Defendant Buchanan signed the 2007 Form 11-K as "Vice-President Compensation & Benefits".   Defendant Buchanan also signed the Harman International 401(k) Retirement Savings Plan – Investment Policy Statement (the "Investment Policy Statement").  Defendant Buchanan also signed the Annual Return/Report of Employee Benefit Plan (Form 5500) for 2006.   Defendant Buchanan is a member of the Administrative Committee.  During the Class Period, defendant Buchanan was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to the Plan and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.  Defendant Buchanan was also a fiduciary of the Plan because she signed fiduciary communications during the Class Period, including SEC filings that the Plan documents specifically incorporated by reference.

(b)    ***Defendant Kevin L. Brown ("Brown")*** acted as a fiduciary with respect to the Plan at times during the Class Period.  Defendant Brown joined the Company in August 2003 as the Chief Financial Officer of Harman/Becker Automotive Systems.  Defendant Brown was promoted to Executive Vice President and Chief Financial Officer in August 2006.  He has also

served as Vice President, Chief Financial Officer and Assistant Secretary of Harman International since July 2005. Defendant Brown is a member of the Administrative Committee. During the Class Period, defendant Brown was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the Plan and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets. Defendant Brown was also a fiduciary of the Plan because he signed fiduciary communications during the Class Period, including SEC filings that the Plan documents specifically incorporated by reference.

19. ***Defendant Harman Investment Committee ("Investment Committee")***. The members of the Investment Committee are plan fiduciaries and supervise the investment of the assets of the Plan, and make decisions concerning investment options available under the Plan. The Investment Committee has authority to select funds and/or investment managers. Its decisions may be, but are not required to be, based on the recommendations of the Investment Consultant. The Investment Committee is comprised of defendants Gregory Henry, Chet Simon, Jeffrey Curtis and Robert Ryan.

(a) ***Defendant Gregory Henry ("Henry)*** was a member of the Investment Committee during the Class Period. During the Class Period, defendant Henry was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the Plan and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(b) ***Defendant Chet Simon ("Simon")*** was a member of the Investment

Committee during the Class Period.  During the Class Period, defendant Simon was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the Plan and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(c)     **_Defendant Jeffrey Curtis ("Curtis")_** was a member of the Investment Committee during the Class Period.  During the Class Period, defendant Curtis was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the Plan and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(d)     **_Defendant Robert Ryan ("Ryan")_** is the Vice President and Treasurer of the Company.  Defendant Ryan was also a member of the Investment Committee during the Class Period.  During the Class Period, defendant Ryan was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the Plan and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

20.     According to Section VIII of the Investment Policy Statement, the Investment Committee is bestowed the following duties:

Investment Performance Review and Evaluation

A.     The Investment Committee will evaluate the investment results of the investment funds at least semi-annually. Performance comparisons will be made against a representative performance universe and market indices set forth in Appendix A.

B.    The Investment Committee, with the assistance of the investment Consultant, shall periodically review the qualitative developments of each investment manager. This evaluation should include, but is not limited to: changes in ownership, personnel turnover, adherence to investment style and philosophy, and other qualities or attributes that the Investment Committee deems appropriate.

C.    *In addition to the previously mentioned evaluation procedures, the Investment Committee shall maintain a "Watch List" for investment funds that are not meeting certain objectives.*    An investment fund will be placed on the "Watch List" when for four consecutive quarters the investment fund under-performs the stated benchmark.

Once a fund is placed on the "Watch List" it is the responsibility of the Investment Consultant to provide further analysis and a recommendation to the Investment Committee.    The analysis and recommendation will focus on the following: personnel turnover, ownership changes, changes in investment approach, style drift, universe ranking, etc.    In addition, once an investment fund is placed on the "Watch List", comments regarding recent performance will be requested from the investment manager.    For each quarter that an investment fund remains on the "Watch List" the investment Consultant must report the status of the investment fund to the Investment Committee.

D.    In the event that a fund does not perform as expected, per criteria C above, and/or fails to meet its stated objective; the fund is subject to replacement.    *The Investment Committee has the authority to make decisions concerning replacement or additional funds.    Should a fund be replaced, the Investment Committee shall identify an appropriate replace fund and move participant assets to the replacement fund* allowing for adequate time and information to participants.

(Emphasis added).

21.    *Defendant Harman Pension Committee ("Pension Committee")*.    Defendants Buchanan and Brown are members of the Pension Committee and are responsible for overseeing the Plan.    As members of the Pension Committee, they are responsible for appointing representatives to the Investment Committee.

22.    Unknown Fiduciary Defendants 1-10 are residents of the United States and are or were fiduciaries of the Plan during the Class Period.    These defendants whose identities are

currently unknown to Plaintiff, may include additional Harman employees. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

**Harman's Fiduciary Status**

23.     ***As "Plan Sponsor."*** Defendant Harman is the Plan Sponsor. The Plan is sponsored by Harman and its adopting affiliates for their eligible employees.

24.     From the beginning of the Class Period until the present, Harman, as the Plan Sponsor, had the responsibility of establishing investment options or alternatives in the Plan and reserved the right to change any investment alternatives, including the right to eliminate investment funds. Thus, this responsibility also included the duty of monitoring the performance of the investment funds, including the Company Stock Fund in the Plan. These are fiduciary functions under ERISA, pursuant to Department of Labor regulations. 29 C.F.R. § 2509.75-8 (D-4).

25.     Throughout the Class Period, Harman, as the Plan Sponsor, also had the duty to appoint, and hence had a duty to monitor and remove, the Trustee, and to execute the Trust documents with the Trustee to provide for the investment, management and control of the assets of the Plan.

26.     ***As "Plan Administrator."*** From the beginning of the Class Period until the present, the Company, as Plan Sponsor, had the duty to appoint itself, an individual, a committee of individuals or a combination thereof to be the "Plan Administrator" of the Plan; in the absence of such an appointment, Harman, as Plan Sponsor, served as the Plan Administrator.

27.     Under tenets of corporate law, Harman is imputed with whatever knowledge the Investment Committee, Administrative Committee, and Pension Committee defendants had

regarding the misconduct alleged herein, and, hence, like the fiduciaries who acted on Harman's behalf, had knowledge of the imprudent actions alleged herein.

28.     Consequently, in light of the foregoing duties, responsibilities, and actions, during the Class Period, Harman was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who are participants in or beneficiaries of the Plan at any time between April 26, 2007 to the present (the "Class Period") and whose accounts included investments in Harman Stock.

30.     Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

31.     ***Numerosity.***   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, over ten thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

32.    *Commonality*.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether Defendants acted as fiduciaries;

(b)    Whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan, the Plan's Participants and its beneficiaries;

(c)    Whether Defendants violated ERISA;

(d)    Whether the Plan suffered a loss and, by extension, members of the Class sustained a diminution in vested benefits, and

(d)    What is the proper measure of loss to the Plan and subsequent allocation of vested benefits to the Plan's Participants.

33.    *Typicality*.  Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff and the other members of the Class, each sustained a diminution in vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

34.    *Adequacy*.  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

35.    Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter,

be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

36.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plan and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

### The Plan

37.    The Plan is an "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

38.    The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

39.    In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a defendant.  Rather, Plaintiff requests relief for the benefit of the Plan and for the benefit of its Participants.

40.    The Plan is a "defined contribution plan" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participants' accounts.

Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

41.    The Plan is a voluntary contribution Plan whereby Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants that are then allocated to Participants' individual accounts.

42.    The Company established the Plan effective April 1, 1989, by merging the following four pre-existing plans: (i) the JBL, Incorporated Retirement, Savings and Profit Sharing Plan; (ii) the Harman-Motive, Inc. Retirement, Savings and Profit Sharing Plan; (iii) the Pyle Industries Profit Sharing Plan; and (iv) the United Recoding Corporation Retirement, Savings and Profit Sharing Plan.

43.    The Harman Plan was subsequently periodically amended and restated.  The Plan was amended and restated effective June 27, 2004 and was subsequently amended.  Effective as of December 31, 2003, the Margi Systems, Inc. 401(k) Plan merged with and into the Plan. Effective as of June 1, 2005, the QNX Software Systems 401(k) Plan merged with and into the Plan.

44.    The overall investment objective of the Plan is to offer Participants investment funds that provide diversification and cover the risk/return spectrum, in order that they may invest on a long-term basis *for retirement*.

45.    The trust investment in Company stock provided that Defendants (as fiduciaries) were subject to the following conditions:

> Fiduciary Duties of Named Fiduciaries.  The Administrator as named fiduciary shall continually monitor the suitability of acquiring and holding Company Stock under the fiduciary duty rules of Section 404(a)(l) of ERISA (as modified by Section 404(a) (2) of ERISA).  The Trustee shall not be liable for any loss, or by

reason of any breach, which arises from the direction of the Administrator with respect to the acquisition and holding of Company Stock, unless it is clear on the face of the direction of the Administrator with respect to the acquisition and holding of Company Stock, that the actions to be taken under the direction would be prohibited under ERISA. The Company hereby appoints as named fiduciaries, solely with respect to the voting of Company Stock held in the Trust and the tender or retention of such Company Stock in response to a tender offer, the eligible employees who are Plan members in the Plan at the time in question. The Company shall be responsible for determining whether, under the circumstances prevailing at a given time, its fiduciary duty to Plan members and beneficiaries under the Plan and ERISA requires that the Company vote for the tender or retention of Company Stock.

46.    The Company's Summary Plan Description ("SPD") provides the following criteria on who can participate in the Plan:

### Who Can Join The Plan

You can participate in the Plan if you have completed your period of eligibility service and are an employee of a participating employer (unless you are excluded from participation as described under "Who Cannot Join the Plan" on page 4).

To satisfy the eligibility service requirement, you must complete 500 hours of service within the 6 consecutive months following your employment date. An hour of service is an hour for which you are paid or eligible to be paid for performing the duties of your job, including paid time off such vacations and holidays. You will not receive hours of service credit for pay you receive as a result of applicable workers' compensation, unemployment compensation, disability insurance laws, or state disability payments.

If you do not meet the eligibility service requirement during the first six months of your employment, your next period of eligibility service will begin on the first day of the next calendar quarter following your hire date. Once you have completed 500 hours of service within any following six-month eligibility period beginning on the first day of any calendar quarter, you will have satisfied the period of eligibility service requirement and may begin participating in the Plan.

47.    The Company's SPD also provides the amount of contribution to the Plan for each eligible participant:

### Your Contributions

When you become eligible to participate in the Plan, you can choose to make contributions to the Plan through tax-deferred payroll deductions. Because your contributions are tax-deferred,

the amount you contribute will reduce the amount of your taxable compensation.  Taxable (after-tax) contributions are not permitted.

You may contribute from 1% to 50% of your eligible compensation in 1% increments up to the maximum annual dollar amount allowed by law.

The maximum dollar amount permitted is established by the U.S. Secretary of the Treasury each year.  The limit in 2005 is $14,000. […].

48.     The Company's SPD also allows eligible Participants to invest all of their

retirement savings in Harman Stock:

### Investing For Extra Growth

\*     \*     \*

One of the investment options available under the Plan is the Harman Stock Fund.  ***An investment in the Harman Stock Fund allows you to invest some or all of your account in the Harman Common Stock.  This SPD is part of the Prospectus covering Harman Common Stock held by the Plan***.  All amounts invested by participants in the Harman Stock Fund will be used by the trustee to purchase shares of Harman Common Stock at market value.  Acquisition or disposition of shares of Common Stock will be made by the trustee on the open market or in such manners and at such times as the Funding Agent determines.  The trustee may purchase or sell Harman Common Stock from or to Harman.

49.     Further, in the Company's Financial Statements and Supplemental Schedule for

December 31, 2006 and 2005, the Plan is described as the following:

#### (a)  General

The Plan is a defined contribution savings and profit-sharing plan sponsored by the Company.   The Plan covers all eligible employees, as defined by the Plan, provided they have completed six months of consecutive service and have worked 500 hours.  The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

#### (b)  Contributions

Participants in the Plan may contribute on a tax-deferred basis from 1% to 50% of their compensation, as defined by the Plan.  Participants may change their deferral percentage as of the first payroll period following receipt of notice to the Plan Administrator.  The Company has made annual basic contributions equal to 3% of the compensation paid to all eligible participants, and a matching contribution equal to 50% of the eligible participant's tax-deferred contribution percentage for each payroll period up to a maximum election of 6% per payroll period.  In addition, the Company may make discretionary profit-sharing contributions to the Plan in an amount determined by the

Company's board of directors. For the years ended December 31, 2006 and 2005, the Board of Directors approved a profit-sharing contribution of 2.5% of each eligible participant's compensation.

*(c)   Participant Account Balances*

Separate accounts are maintained for each participant's salary deferral, rollover, employer profit sharing, basic, and matching contribution balances. Earnings or losses of the Plan are allocated to participant account balances by investment fund on a daily basis according to the number of shares in the participant account balances. Company profit-sharing and basic contributions are allocated based on participant compensation. Company matching contributions are allocated based upon each participant's tax-deferred contribution percentage.

*(d)   Vesting*

Participants are 100% vested in their salary deferral contribution, employer's basic contribution, and rollover contribution accounts, and become vested in profit-sharing and matching contributions at the rate of 25% per year after the completion of two years of service, or 100% after reaching age 65, death, or disability.

*(e)   Investment Options*

Plan participants direct contributions in any increment in any of the investment options. The options consist of the Company's common stock, the Putnam Stable Value Fund, the Putnam S&P 500 Index Fund, the Putnam Money Market Fund, and 13 mutual funds.

*(f)   Benefits*

On separation from service or termination of service due to death, disability or retirement, a participant may elect to receive an amount equal to the value of the participant's vested interest in his or her account in a lump-sum distribution.

50.    Moreover, according to the Company's Schedule H, attached to its Form 5500, the Plan held $56,794,767 in Company stock.

51.    Also, investment in the common stock of Harman comprised approximately 20% and 25% of the Plan's investments as of December 31, 2006 and 2005, respectively.

## Plan Fiduciaries

52.    *Named Fiduciaries*.    ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary,

and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

53.    ***De Facto Fiduciaries***.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

54.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing Plan documents, through their conduct, and under ERISA.

55.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan -- and the Plan's investments -- solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

56.    Plaintiff does not allege that each defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or

exercised by each of them, and, as further set forth below, the claims against each defendant are based on such specific discretion and authority.

## BACKGROUND

57.     On April 26, 2007, Defendants announced that Harman had agreed to be acquired by KKR and Goldman (the "Purchasing Companies") pursuant to the terms of a "Merger Agreement."  Under the terms of the Merger Agreement, the Company stockholders (including Plan Participants) would receive $120 in cash for each share of Harman common stock they hold.  As an alternative to receiving the cash consideration, the Company's stockholders would be offered the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman stock for shares in the new corporation incorporated by KKR and Goldman.

58.     On release of this news, Harman stock closed at $122.50 per share – 19% higher than on April 25, 2007.

## A.    **The Merger Agreement**

59.     The Merger Agreement set forth customary representations and warranties and the Company "agreed to customary covenants, including covenants regarding operation of the business of the Company and its subsidiaries prior to the closing."

60.     The Merger Agreement was attached to a Company press release and filed with the SEC on a Form 8-K on April 27, 2007.  The Form 8-K was a fiduciary communication and was incorporated into Plan documents, including, but not limited to, the Company's SPD.

61.     The Merger Agreement contained a provision regarding the Company's capital expenditures (the "CapEx provision").  The CapEx provision restricted capital spending and expressly provided that "the Company shall not permit any of its Subsidiaries to, without the prior written consent of Parent (not to be unreasonably withheld or delayed):

(vi) make any capital expenditures (or authorization or commitment with respect thereto) in a manner reasonably expected to cause expenditures (x) to exceed the capital expenditure budget for the 2007 fiscal year previously provided to Parent or (y) for the 2008 fiscal year to exceed the 2008 capital expenditure budget taking into account reasonably anticipated expenditures for the balance of the year as well as expenditures already committed or made (assuming for this purpose that fiscal 2008 capital expenditure budget will not exceed 111% of the fiscal 2007 capital expenditure budget).

62.    In addition to the CapEx provision, the Merger Agreement also contained a provision that allowed the Purchasing Companies to terminate the Merger Agreement in the event of a material adverse change in the Company's business.  This provision entitled "MAC" provided in relevant part:

(a) Since December 31, 2006, through the date of this Agreement, except for the transactions contemplated hereby, the business of the Company and its Subsidiaries has been conducted, in all material respects, in the ordinary course of business consistent with past practice.

(b) (i) Since December 31, 2006, through the date of this Agreement, there has not been any facts, circumstances, events, changes, effects or occurrences that, individually or in the aggregate, would be reasonably expected to have, a Company Material Adverse Effect; and (ii) since the date of this Agreement there shall not have occurred any event, change, effect or occurrence that, individually or in the aggregate, would be reasonably expected to have a Company Material Adverse Effect.

63.    A "Material Adverse Effect" was defined as:

"Company Material Adverse Effect" means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts, circumstances, events, changes, effects, or occurrences, (1) has or would be reasonably expected to have a *material adverse effect on or with respect to the business, results of operation or financial condition of the Company* and its Subsidiaries taken as a whole, or (2) that prevents or materially delays or materially impairs the ability of the Company to consummate the Merger . . . .

(Emphasis added).

## B.    The MyGIG Radio

64.    Prior to the Class Period, Defendants had entered into a contract with Chrysler to manufacture MyGIG radios for Chrysler.  Upon information and belief, the MyGIG radio was

produced as a "mid-level" infotainment system to be installed in Chrysler vehicles, including minivans, Dodge Nitros and 300 Sedans.

65.    Upon information and belief, the Company had entered into this contract with Chrysler to fill a revenue hole that was expected from the loss of revenue generated by sales to Mercedes of first generation navigation system units.

66.    The Mercedes contract had generated $400 million annually for the Company and Defendants knew or were reckless in not knowing that the Company's revenue in fiscal 2007 and 2008 would be adversely impacted by the related loss of revenue.

67.    Upon information and belief, the Chrysler sales contributed significantly less to operating income and operating margins than the Mercedes contract had been contributing prior to fiscal 2007.  Defendants knew or recklessly disregarded that the Company's earnings would decrease in fiscal 2007 and fiscal 2008.

68.    In the Company's 2006 Annual Report, issued on September 6, 2006, the Company touted the Chrysler MyGIG radio as a state-of-the art infotainment system and represented that it was an important milestone in Company history because it was the "first true Infotainment System to be offered by one of the traditional Big 3 American automakers."

69.    Upon information and belief, distribution of the MyGIG radio was supposed to take place in 2006, but it was significantly delayed until 2007 as a result of supply issues and the Company's inability to fulfill production needs.

70.    Upon information and belief, the MyGIG radios were also riddled with various technical and cosmetic defects.

71.    Upon information and belief, the Company failed to produce the MyGIG radios on the timetable that it had previously promised Chrysler.

72.    Upon information and belief, throughout fiscal 2007, Chrysler reduced the number of orders for the MyGIG.  This reduction in orders (and in turn production in product) resulted in a reduced need by the Company for parts for the MyGIG radio.  Thus, the Company reduced its orders for parts from suppliers and, as a result, suppliers raised their prices to supply a diminished number of parts.

73.    Upon information and belief, the contract the Company signed with Chrysler in 2005 to provide Chrysler with MyGIG radios created a loss rather than a profit for the Company because each radio cost more money to build than what the Company received from Chrysler on the sale.

74.    During the Class Period, Defendants reported that the Company's Automotive division's total operating income for fiscal 2007 was approximately $340 million.  Upon information and belief, the Company's forecasted loss resulting from the MyGIG production and sales was highly material to the Company's Automotive division.

75.    Upon information and belief, annual sales for the Automotive division were $450 million in North America, and the Company was looking at annual sales of the MyGIG radio to Chrysler of $250 million.  Thus, while the Company's highly touted MyGIG radio was slated to generate more than 50% of Automotive sales in North America, it would only generate those sales by selling the MyGIG radios at a substantial loss of approximately $32 million annually.

76.    An annual loss of $32 million equals approximately 10% of Harman Automotive's total operating income.

77.    Upon information and belief, Defendants were unsuccessful in renegotiating the contract with Chrysler after several attempts to renegotiate it in 2006 and 2007.

**C.**    **The Personal Navigation Device ("PND") Sales and Margins**

78.    Upon information and belief, the Company brought its PND product to market in Europe as part of the "Aftermarket" division of its Automotive sector, which sold PNDs and other electronic equipment to aftermarket retailers.  In early 2006, the Company started selling PNDs and initially sold several thousands of PND units in the Third Quarter of fiscal 2006 (January-April 2006).  Shortly thereafter, the Company launched a new PND model, which the Company expected to double or triple its PND sales.

79.    In or around October 2006, Defendants reported that the Company had enjoyed PND success in Europe and reported that Aftermarket sales were "robust" and that it had sold 95,000 PND units in fiscal First Quarter 2007 (July-August 2006).  Based on fiscal First Quarter 2007 sales of PNDs, defendant S. Harman stated that the Company expected to sell "well over 500,000 units" in Europe in fiscal 2007.

80.    In or around January 2007, defendant S. Harman reported that the Company had sold almost 250,000 PNDs for the first half of fiscal 2007 and claimed that the Company's PND sales were accelerating.  As a result, Defendants raised projections for sales and stated that for the year the Company "now expects sales to exceed 650,000 units."  Defendants claimed that in certain areas of Europe Harman sold the second leading PND brand and its position was strengthening "even as margin holds relatively firm."

81.    On April 26, 2007, defendant Brown stated that the selling price in Europe on Harman's PND was approximately $350 per unit and that the Company had sold approximately 130,000 units in fiscal Second Quarter 2007.

82.     However, upon information and belief, the Company's PNDs had not been selling in the numbers that Harman had publicly projected in 2006 and, consequently, many of the PNDs were being stored in a warehouse.

83.     Also, upon information and belief, in 2007 the Company's PNDs did not sell in the amounts the Company had projected and therefore the Company had a stockpile of PNDs in inventory.

84.     In 2007, the Company had dropped the price of its PNDs by approximately $100 and, upon information and belief, it made a modification to the PNDs early in 2007 that rendered obsolete the Company's stockpile of PNDs.

85.     Upon information and belief, the Company released approximately five versions of the same PND between March 2006 and July 2007, but it was not until July 2007 that the Company sold a significant number of the devices.

86.     Also, upon information and belief, the Company was about one year late in releasing a saleable PND and therefore sales were slow because the PNDs were priced too high to compete with other PNDs.

87.     Upon information and belief, the Company missed projected sales of PND units in fiscal 2007 by more than 200,000 units, notwithstanding that Defendants had engaged in aggressive price reductions to move obsolete PND inventory in June 2007.

88.     Upon information and belief, in June 2007 (immediately prior to the Company's fiscal year end), Defendants entered into an agreement to sell 100,000 PND devices to a customer called Paragon for $240 each, which was $110 lower than the Company's $350 selling price publicly disclosed by defendant Brown on April 26, 2007.

89.     Upon information and belief, the sale of 100,000 PND units in Fourth Quarter fiscal 2007 had failed to materialize and the sale to Paragon were not completed before fiscal year end.

90.     Although the Company agreed to sell 100,000 PND units to Paragon at $240 each in July 2007, upon information and belief, Defendants missed their projected PND sales by at least $85 million in fiscal 2007.

### SUMMARY OF ACTION

91.     On September 21, 2007, Harman shocked investors (including Plan Participants) when it announced that its previously highly touted merger with a company formed by KKR and Goldman – valued at approximately eight billion dollars ($8,000,000,000) – was no longer going to be completed and had been abandoned.  According to the Company, the Purchasing Companies "informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the merger agreement and that they are not obligated to complete the merger."

92.     On this news, shares of the Company's stock fell from the previous day's closing price of $112.34 to a September 21, 2007 close of $85.00, a drop of $27.34.  Moreover, the Company's share price continued to fall and closed on September 24, 2007, the next trading day, to $80.31 per share on adverse and unexpected news about excessive research and development expenses, and the possibility that there would be no earnings growth in the 2008 fiscal year.  The merger had been premised on Harman's purported dynamic future growth prospects.  Therefore, within two trading days, the Company's share price fell approximately $32 per share, or almost 30 percent, on extremely heavy trading volume.

93.     During the Class Period, Defendants knowingly or recklessly failed to disclose material adverse facts about the Company's financial condition.  At the center of the Company's deteriorating financial condition were two new products produced and sold by the Automotive division, the MyGIG radio and the PND.

94.     In addition, Defendants knowingly or recklessly failed to disclose that Harman's capital expenditures were spiraling out of control; that its sales of MyGIG radios and PNDs were causing and would continue to cause operating margins to decline; and that because of delays in production and mechanical and quality control problems with the MyGIG radio, the Company's relationship with Chrysler had deteriorated.

95.     Indeed, it was these material undisclosed facts that placed the Company in breach of the Merger Agreement.

96.     As fiscal year 2008 started, Defendants were finding it extremely difficult to maintain their false projections of operating income and earnings per share.  Indeed, Defendants had knowingly or recklessly presented to investors, analysts and Plan Participants materially false and misleading information regarding the Company's Automotive division's sales, operating income, operating margins and earnings per share during the Class Period.  However, on January 14, 2008, prior to the market's open, the Company announced that it had significantly reduced its previously-announced guidance and lowered projected earnings per share for fiscal 2008 to between $3.00 and $3.10 per share, which was over 40% lower than the $5.25 per share earnings originally forecasted by Defendants for fiscal 2008.

97.     However, the full truth was still not disclosed.  It was not until February 5, 2008 that the Company announced its financial results for the fiscal Second Quarter 2008, and disclosed that its Automotive division's earnings were "under pressure" due to decreases in PND

sales and margins caused by "aggressive price reduction by competitors, the delay of new products, and the sale of older products at substantial discounts." In response, shares of the Company's stock fell from a closing price of $45.73 on February 5, 2008 to $38.70 on February 6, 2008, which was more than a 15 percent drop in the stock price per share in one day.

98.    What Defendants knew or recklessly disregarded, but failed to disclose to Plan Participants, was that the Company's capital expenditures were spiraling out of control, in breach of the CapEx covenant in the Merger Agreement. Indeed, Defendants later admitted that the Company's Automotive division, headquartered in Germany, had "binged on capital spending" and spent "$60 million in one month," and that there were no controls in place to prevent this exuberant spending.

99.    Additionally, Defendants failed to disclose that one of the Company's largest contracts, a contract to supply Chrysler with MyGIG radios for installation in mid-level vehicles, was underbid and was causing the Company to lose money, and, consequently, was negatively impacting profit margins. The MyGIG radio deal was also plagued with other problems from the beginning, including delays in production and mechanical issues that prevented the radios from working properly. As Chrysler decreased its orders for the MyGIG radios, a large inventory of unsold radios accumulated. Ultimately, Harman's relationship with Chrysler – on which the Company had depended for 26% of its net sales – deteriorated beyond repair.

100.    Finally, the Company belatedly disclosed that it was also experiencing disappointing sales of its PND products in Europe and high levels of PND inventory due to delays in production, competitive pricing, and newer competing models. Indeed, the Company had begun selling obsolete PNDs at deep discounts. Thus, the situation with respect to the PNDs was precisely the same as with the MyGIG radio: Harman had invested substantial sums of

money in developing, manufacturing, and marketing a product which it either could not sell or was selling at a substantial loss. Despite Defendants' knowledge or reckless disregard during the Class Period of material adverse facts concerning the Company's PNDs – notably, a large sale and return of PNDs in early fiscal 2008, and the fact that costs associated with the PNDs had caused the Company to miss its First Quarter 2008 earnings forecast – Defendants did not fully disclose these facts to investors until February 5, 2008.

## FALSE AND MISLEADING STATEMENTS TO PLAN PARTICIPANTS

101.    The Class Period starts on April 26, 2007.  It was on this day that the Company issued a press release entitled *Harman International Industries To Be Acquired By KKR And GS Capital Partners*.  Therein, the Company stated in relevant part:

### Harman Stockholders Can Elect to Receive $120 Per Share In Cash or Shares in Post-Transaction Company

### Transaction Valued at Approximately $8 Billion

Harman International Industries, Inc. (NYSE: HAR) today announced that it has entered into an agreement to be acquired by affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners ("GSCP") in a transaction valued at approximately $8 billion.  The transaction was unanimously approved by the Harman Board of Directors, following the recommendation of a Special Committee of independent directors.  KKR initiated discussions with Harman and structured the transaction so that current Harman stockholders have the opportunity to participate in the future upside potential of the enterprise.  The company will continue to be named Harman International Industries and Dr. Sidney Harman, Founder and Executive Chairman, will remain Executive Chairman.

*        *        *

Under the terms of the agreement, ***Harman stockholders will be entitled to receive $120 in cash for each share of Harman common stock they hold.***  As an alternative to receiving the cash consideration, Harman's stockholders will be offered the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman stock for shares in the new corporation incorporated by KKR and GSCP in order to acquire Harman.  The total amount of Harman shares that may elect to receive shares in the post-transaction corporation is approximately 8.3 million, which would represent $1.0 billion (at the $120 per share transaction value) and an approximate 27% equity stake in Harman following the transaction.  If elections for post-transaction

shares exceed the $1.0 billion cap, post-transaction shares will be allocated to electing stockholders on a pro-rated basis, and the remaining Harman shares will be exchanged for cash. The election process will be fully detailed in the proxy statement/prospectus that will be mailed to Harman stockholders.

Dr. Harman, who owns approximately 5% of the outstanding common stock of Harman, will participate in the same election process available to all stockholders. He has committed that he will elect to exchange half of his current holdings for post-transaction shares, subject to the same pro ration that applies to all stockholders as described above.

\*      \*      \*

Completion of the transaction, which is expected to occur in the third quarter of 2007, is subject to the approval of Harman stockholders, customary closing conditions and regulatory approvals. The Board of Directors of Harman has unanimously recommended that Harman stockholders vote in favor of the transaction.

102.    In commenting on the Merger Agreement with the Purchasing Companies in the same press release, defendant S. Harman stated, in relevant part, that:

We are pleased to reach an agreement with KKR and GSCP that is in the best interest of our stockholders [including Plan Participants], presenting them with excellent value for their shares and the opportunity to participate in Harman's future growth. KKR and GSCP are two of the world's leading private equity investors and our Board of Directors strongly believes that this transaction will create attractive long-term opportunities for our employees, customers and business partners. Together, we will continue to execute our strategic plan, capitalize on new opportunities, and build on our history of product innovation and service excellence.

103.    This April 26, 2007 press release was filed with the SEC on a Form 8-K on April 26, 2007. This Form 8-K was a fiduciary communication and was incorporated into Plan documents, including, but not limited to, the Company's SPD.

104.    On that same day, the Company held a conference call to discuss its Third Quarter 2007 results. During the conference call, defendant S. Harman stated in relevant part:

We begin the fourth quarter of the year and we look to fiscal '08 with a backlog of $14 billion. *We continue to expect fiscal '08 Automotive OEM revenues at $2.8 billion and EPS of $5.25*, subject to the probability that we will not be able to absorb the $46 million engineering bulge I identified in our previous earnings call. Let me remind you that the bulge is driven by work on $1.1 billion

of new business unanticipated when we first planned fiscal '08, and by continuing new work on Driver Assist. If we are unable to absorb the $46 million R&D bulge, the projected fiscal '08 EPS would become $4.79.

\*     \*     \*

I had indicated in earlier conference calls that the PND environment in Europe was not as margin challenged as it is in the United States, but that we could surely anticipate it. There was reasonable foresight in that observation. In the recent quarter, the European PND market has become extremely competitive. We are working extraordinarily hard to increase sales and to maintain adequate margins in that environment. In our earnings call three months ago, it was noted that Harmon/Becker PND inventories in Europe had grown substantially. We said then that the inventory had been developed to support a vigorous sales effort and that we planned to reduce it to normal levels at year-end. *The plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and that plan is proceeding. Where March 31 inventory was $75 million, we expect April 30 inventory to be approximately $50 million, May 31 inventory to be approximately $30 million, and June 30 inventory to be approximately $15 million, that is a very normal level.* Overall, the European market for our high fidelity and multimedia products is a very bright spot in our consumer business.

\*     \*     \*

Inventories were $480 million at March 31, an increase of $142 million compared to the prior year. *As of the second quarter, inventory increases are primarily in Automotive to support the growing PND business. Higher sales and new product launches at Consumer and Pro, as well as currency translation, also impacted inventories*.

(Emphasis added).

105.    In answering a question from an analyst, defendant S. Harman made the following

remarks regarding the Company's R&D expenses:

**JEFF KESSLER**:  I guess the question that we have is around continuing to match R&D to the revenue structure, as you see it, given that you have programs in place that are obviously important and obviously have a lot of potential.  But getting your hands around the expense levels relative to new programs, are there some – you've mentioned one or two that are in line to produce over the next several years. *Is there anything that we should be aware of which is maybe going to change that R&D-to-revenue percentage, let's say, 18 months out or so?*

**SIDNEY HARMAN**:  Are you asking whether the percentage of revenue represented by R&D will increase or decrease?

**JEFF KESSLER**: I'm asking, again, how are you going to get that decrease? In other words, where is the return on that R&D going to come from?

**SIDNEY HARMAN**: I've got it. In two ways, really. *Understand first that the increase is, from our point of view, a very constructive thing.* The so-called bulge was generated by the receipt of awards that we did not contemplate when we were generating the plan and generating our guidance. The engineering represented in that bulge is essentially for the new BMW award and the development of Driver Assist, which we believe has very positive implications down the road. I have not yet answered your question, but I thought it useful to set that base.

Now we believe -- and I have made this clear numbers of times -- we believe that in the growth of the Company and in the urgency of getting the job done in what was a substantially new world of technology, the primary objective was just that -- get it done and, in effect, damn the cost. We are still in that surge mood. I should be careful about the use of that word, I suppose. *But I am convinced, Kevin is convinced, our Board is convinced that over time -- and reasonable time -- we can rationalize that engineering so that as a percentage of sales -- and remind you sales will be going up, so that if the engineering expense stayed fixed, the percentage would decline so it moves us constructively in that direction -- but we believe that we can rationalize, generate efficiencies such as to permit us to improve that percentage by approximately 100 basis points a year over the next several years*.

(Emphasis added).

106.    During the same conference call, defendant Brown stated in relevant part the following:

Total Harman International R&D expenses in the third quarter were $90 million, or 10.2% of sales, compared to $74 million, or 9.2% of sales, in the same quarter of the prior year. As Sidney discussed, R&D is trending higher than we had anticipated as we work to develop new technologies and new programs. We expect fiscal 2007 R&D expenses to approximate 10% of full-year sales. *In fiscal 2008, we anticipate R&D will begin to decrease as a percentage of sales*. The increase in R&D explains $16 million of the $20 million increase in SG&A in the third quarter compared to the prior year. Despite the increase in R&D, total SG&A as a percent of sales remained relatively flat at 23% of sales in the quarter.

(Emphasis added).

107.    In addition, defendants S. Harman and Brown responded to analysts' questions regarding defendant S. Harman's reference to sales of PNDs and increased competition for PNDs in Europe:

**JAIRAM NATHAN**: Okay, just one more question.  On the European PNDs, you said that the competition has kind of increased. Is it because of higher competition that you're seeing pricing pressure or is it because the growth is slowing and there are more people vying for the same growth?

**SIDNEY HARMAN**: No, I think it is the former.

**JAIRAM NATHAN**: It is just more competition?

**SIDNEY HARMAN**: Oh, yes.

                    *       *       *

**PETER FRIEDLAND**: Okay. And then as far as Becker PND units, you said you're still on track for 618,000 units for fiscal '07. Where are we year-to-date?  And then the second question on the Harman Kardon PND, what are the units there?

**SIDNEY HARMAN**: While Kevin is checking his records, let me just tell you that the Harman Kardon PNDs are just too early to even begin to read retail sales. They are moving into retail channels. Ask us in the next quarter.

Peter, do you have information on the --?

**KEVIN BROWN**: Yes, the Harman Kardon PND unit sales for the quarter were about 84,000 units.  For the nine months are over 300,000 units. The Becker -- I'm sorry -- did I say Harman Kardon?

**SIDNEY HARMAN**: Corrected it, please.

**KEVIN BROWN**: The Becker -- *the European PND unit sales*.

**PETER FRIEDLAND**: Okay. *So 300,000, and you still think you can do over 600,000 for the fiscal year?*

**SIDNEY HARMAN**: *We do, and we said so*.

**PETER FRIEDLAND**: Okay, great. Thank you.

(Emphasis added).

108.    Defendants' statements above regarding sales, increasing "Automotive OEM revenues," and forecasted "EPS of $5.25" in fiscal 2008, subject to a bulge of R&D expenses, were false, upon information and belief, because Defendants knowingly or recklessly failed to disclose the following material adverse facts about the Company's business and financial prospects:

(a)    Harman's increasing sales and operating margins in the Automotive segment were being adversely affected in fiscal 2007 by much more than bulging R&D expenses, which the Company presented as a positive indicator of Harman's financial condition and prospects.

(b)    Defendants knowingly or recklessly projected earnings of $5.25 for fiscal 2007 when, at the time, they had no reasonable basis for their guidance and they were knowingly or recklessly deceiving the investing public (including Plan Participants) by failing to disclose that in addition to increased R&D expenses, the Company was experiencing growing material losses and declining operating margins.

(c)    Defendants had presented projected operating and earnings results to the Purchasing Companies which they knew had no reasonable basis and failed to present the Company's true financial condition and future earnings and prospects. Upon information and belief, the Company's projected operating and earning results were significantly lower than what they provided to the Purchasing Companies. Upon information and belief, the Company's Automotive division was selling mid-level MyGIG infotainment systems to Chrysler and PNDs that generated significantly lower operating income and operating margins than the Company had generated in fiscal 2007.

109.    Defendants' statements set forth in paragraphs 104-107 regarding opportunities through "expansion of Infotainment" systems placed in "midrange" automobiles were, upon information and belief, materially false because during fiscal 2007 and throughout the Class Period, Defendants knew or recklessly disregarded that the Company's expansion into infotainment systems for mid-level vehicles with Chrysler would increase losses for the Company and cause material declines in the Company's operating income as a percentage of net sales during the Class Period, for at least the following reasons:

(a)    Upon information and belief, the contract the Company signed with Chrysler in 2005 to provide Chrysler with MyGIG radios created a loss rather than a profit for the Company because each radio cost more money to build than what the Company was actually selling to Chrysler.

(b)    Upon information and belief, Defendants had been unable to renegotiate the MyGIG contract with Chrysler. Therefore, Defendants were aware that during the Class Period, the Company was taking a material loss on sales of the MyGIG radios to Chrysler.

(c)    Upon information and belief, the MyGIG radios were riddled with technical problems and defects. Upon information and belief, the gear motor that drove the faceplate of the radio and enabled the faceplate to lift upward so that a CD could be inserted, for example, did not

work properly. In addition, upon information and belief, the radio had software issues that, at times, prevented the radio system from even turning on.

(d)     Upon information and belief, Chrysler's relationship with the Company was rapidly deteriorating. The MyGIG radio rollout was supposed to take place in 2006, but was significantly delayed until 2007 due to supply issues and the Company's inability to fulfill production needs. Upon information and belief, the Company had repeatedly delayed production of the radios and gave no satisfactory explanation for the delays to Chrysler.

(e)     Upon information and belief, in early 2007, Chrysler had reduced its number of orders for the MyGIG radio. This decrease in orders and production resulted in reduced needs for parts for the MyGIG radio to be ordered by the Company, which caused suppliers to raise prices for the parts.

(f)     Upon information and belief, the Company was changing components on the MyGIG radio without disclosing the changes to Chrysler, and ultimately caused Chrysler to have to shut down installation of the radios in certain vehicles because of quality control problems. These and other quality control problems caused a decline in the relationship between the Company and Chrysler. Upon information and belief, during the Class Period, the Company was making changes without telling Chrysler or getting the appropriate approvals from Chrysler.

110.    Defendants' statements set forth in paragraphs 104 and 105 regarding "growing" PND sales and related "inventory increases" and forecasted PND sales of "618,000 units" in fiscal 2007 were, upon information and belief, materially false for at least the following reasons:

(a)     During fiscal 2007 and throughout the Class Period, Defendants knew or recklessly disregarded that the Company's foray into PND sales in Europe would cause material declines in its operating income as a percentage of net sales during the Class Period.

(b)     Upon information and belief, the Company had a large inventory of older generation, obsolete PNDs, which it could not sell or was forced to sell at a substantial loss, and prospects for future sales of PNDs were being adversely affected by increasing competition and pressures from competitive pricing.

(c)     Upon information and belief, PNDs had not sold to the Company's expectations in 2006, and many of the devices, consequently, were being stored in a warehouse. Likewise, in 2007, upon information and belief, the Company's PNDs did not sell to projection, and the Company had a stockpile of the devices in inventory.

(d)    Upon information and belief, in early 2007, the Company made a modification to its PND, which rendered all of the older-generation units in inventory obsolete.

(e)    Upon information and belief, the Company released several versions of the same PND between March 2006 and July 2007, but it was not until July 2007 that the Company even sold a significant number of the devices.

111.    On April 27, 2007, the Company filed a Form 8-K with the SEC providing additional guidance on the merger with the Purchasing Companies.  The Form 8-K stated in relevant part the following:

On April 26, 2007, Harman International Industries, Incorporated, a Delaware corporation (the "Company"), entered into an Agreement and Plan of Merger (the "Merger Agreement") with KHI Parent Inc., a Delaware corporation ("Parent"), and KHI Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Merger Sub").

The Merger Agreement provides for the merger of Merger Sub with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Parent. Merger Sub and Parent are affiliates of Kohlberg Kravis Roberts & Co., L.P. ("KKR") and GS Capital Partners ("GSCP", and together with KKR, the "Sponsors) formed by the Sponsors in order to acquire the Company.

*        *        *

The Board of Directors of the Company has unanimously determined that the Merger is in the best interests of the Company and its stockholders, and declared advisable, to enter into the Merger Agreement, approved the Merger Agreement and resolved to recommend adoption of the Merger Agreement by Company stockholders.

*        *        *

The closing of the Merger is subject to customary closing conditions, including adoption of the Merger Agreement by the Company's stockholders and antitrust clearance.  Closing is not subject to any financing condition but the closing may be delayed in certain circumstances to facilitate financing.  The Merger is expected to be completed in the third calendar quarter of 2007.

*        *        *

The Company has made customary representations and warranties in the Merger Agreement and agreed to customary covenants, including covenants regarding operation of the business of the Company and its subsidiaries prior to the closing.

*        *        *

The Merger Agreement has been included to provide investors and security holders with information regarding its terms. It is not intended to provide any other factual information about the Company, Parent, or their respective subsidiaries and affiliates. The Merger Agreement contains representations and warranties by the Company, on the one hand, and by Parent and Merger Sub, on the other hand, made solely for the benefit of the other. The assertions embodied in those representations and warranties are qualified by information in confidential disclosure schedules that the parties have exchanged in connection with signing the Merger Agreement. The disclosure letter delivered to Parent in connection with the Merger Agreement contain information that modifies, qualifies and creates exceptions to the representations and warranties set forth in the Merger Agreement. Moreover, certain representations and warranties in the Merger Agreement were made as of a specified date, may be subject to a contractual standard of materiality different from what might be viewed as material to stockholders, or may have been used for the purpose of allocating risk between the Company, on the one hand, and Parent and Merger Sub, on the other hand. Accordingly, the representations and warranties in the Merger Agreement should not be relied on by any persons as characterizations of the actual state of facts about the Company, Parent or Merger Sub at the time they were made or otherwise.

112.    This press release was filed with the SEC on Form 8-K on April 27, 2007. The press release was a fiduciary communication and incorporated into Plan documents, including, but not limited to, the Company's SPD.

113.    On May 10, 2007, the Company filed its third quarter financial report with the SEC ("2007 3Q Form 10-Q"). The statements listed above in paragraphs 104-107 were also incorporated into the Company's 2007 3Q Form 10-Q. Defendant S. Harman also certified the 2007 3Q Form 10-Q by stating that: "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

114.    The 2007 3Q Form 10-Q also disclosed that net sales to Chrysler were a significant portion of the Company's total net sales during that period:

We anticipate that DaimlerChrysler, Toyota/Lexus, Audi/VW and BMW will continue to account for a significant portion of our net sales and accounts receivable for the foreseeable future." Notably, the Company recognized that "[t]he loss of sales to DaimlerChrysler, Toyota/Lexus, Audi/VW or BMW *would have a material adverse effect on our total consolidated net sales, earnings and financial position*.

(Emphasis added).

115.    In addition, the 2007 3Q Form 10-Q stated that (i) "sales of our aftermarket products were higher due to the introduction of Becker PNDs in Europe"; (ii) for the nine months ended March 31, 2007, net sales were $2.640 billion, *an increase of 11 percent* over the same period in 2006; and (iii) the Company's operating income was reported as $92.1 million for the Automotive division for the quarter ended March 31, 2007, and $274.7 million for the nine months ended March 31, 2007.

116.    The 2007 3Q Form 10-Q further stated that cash flows from operations for the nine months ended March 31, 2007 were $47.1 million compared to $241.3 million for the same period the prior year, and attributed the decrease in part to higher working capital requirements, and more specifically to a $280.4 million increase in working capital "primarily due to higher inventory levels to support increased sales to [the Company's] automotive customers and to support [the Company's] newly developed PND market in Europe."

117.    The statements set forth in paragraphs 114-116, including that the Company's net sales in the Third Quarter of fiscal 2007 had exceeded sales in corresponding prior-year periods by some 11%; that Daimler-Chrysler would "continue to account for a significant portion of [the Company's] net sales and accounts receivable for the foreseeable future"; that the Company's sales were higher because of the introduction of PNDs in Europe; and that the Company had intentionally accumulated a high inventory of PNDs to support "increased sales" and the "newly developed PND market in Europe," were false and misleading because Defendants knowingly or recklessly failed to disclose material adverse facts about the Company's business and financial

prospects, as described in paragraphs 108-110.

118.     The 2007 3Q Form 10-Q was a fiduciary communication and incorporated into Plan documents, including, but not limited to, the Company's SPD.

119.     On August 14, 2007, the Company issued a press release entitled *Harman International Reports Fourth Quarter And Full Year Results*.  It was in this release that the Company stated that "Automotive net sales for the fiscal year were $2.493 billion compared to $2.238 billion a year ago, an increase of 11 percent compared to last year" and that for the Fourth Quarter compared to the prior year, "Automotive sales were $635 million, an increase of 6 percent."  Defendant S. Harman also stated in relevant part:

> We achieved good results in fiscal 2007 and completed the year with a strong balance sheet.  Automotive expanded its Infotainment Systems offerings from luxury to mid-range and entry-level cars.  Professional continues to grow through development of new technologies enabling simplified and centralized control of complex audio systems.  Consumer sales were higher than last year but tremendous competition in the multimedia market had an adverse effect on operating margins. Our balance sheet was strengthened by repurchasing $129 million of our common stock during the year and reducing debt by $121 million.
>
> On April 26, 2007, Harman announced that it had entered into a merger agreement with affiliates of Kohlberg Kravis Roberts & Co. L.P. and GS Capital Partners in a transaction valued at approximately $8 billion.  ***We anticipate completing the transaction during the third or fourth quarter of this calendar year***.

(Emphasis added).

120.     The statement that the Company "anticipates completing the transaction during the third or fourth quarter of this calendar year" was false and misleading because Defendants knew or recklessly disregarded that the Company's increased costs and decreasing profit margins had caused or likely would cause the Company to trigger the terms of the MAC clause in the Merger Agreement and threaten its proposed merger.  The same undisclosed increased costs and decreasing operating margins that had caused the material decline in the Company's operating

income had caused or likely would cause the Company to breach the terms of the Merger Agreement and would continue to result in significantly lower earnings for First, Second and Third Quarter fiscal 2008 for the reasons described in paragraphs 108-110.

121.    In addition, the statement identified in paragraph 119 lacked a reasonable basis in fact because Defendants also failed to control excessive capital spending as part of the Company's effort to ramp up the new Missouri plant, which was built to manufacture the MyGIG radios for Chrysler.  Upon information and belief, delays at the Missouri plant and quality control issues with the MyGIG radio had severely strained the Company's relationship with Chrysler, and the Company was burning through cash to build the plant and ramp it up to manufacture the MyGIG radio.  Defendants failed to disclose that cost overruns at the Missouri plant and other facilities had caused the Company to breach the CapEx covenant in the Merger Agreement, as follows:

> (a)    Defendant S. Harman admitted that in the Fourth Quarter of fiscal 2007, the Company had engaged in exuberant spending.  After the Purchasing Companies terminated the Merger Agreement, defendant S. Harman stated that the Company's Harman Becker division, the Automotive division headquartered in Germany, had "binged on capital spending" in June 2007, "spending $60 million in one month." According to a *Fortune* article dated January 24, 2008, there were no controls in place to prevent this "überschwang," or exuberance. The article quoted Dinesh C. Paliwal as stating "Harman lacks certain widely accepted management 'processes' and that he [Paliwal] is now busy installing them."
>
> (b)    Defendant S. Harman reported to *Fortune* that this reckless spending binge caused the Company's capital expenditures to exceed $90 million in fiscal Fourth Quarter 2007 (April 1, 2007 through June 30, 2007) alone and over $174.4 million for fiscal 2007, which was more than $24 million over the $150 million forecast by Defendants three months earlier.  Capital expenditures were $12.4 million, $27 million, and $45 million in the First, Second, and Third Quarters of fiscal 2007, respectively.    Defendants' unbridled capital spending of $60 million in June 2007 and an additional $30 million prior to that between April and May 2007 violated known specific and quantified

restrictions on capital expenditures in the Merger Agreement. As stated in the *Fortune* article dated January 24, 2008, reporting on the terminated Acquisition and breach of the CapEx covenant, the "$25 million overrun became evidence that KKR cited as a justification to kill the deal."

122. On August 24, 2007, the Company held a conference call to discuss its Fourth Quarter 2007 financial results. During the conference call, defendant S. Harman stated in relevant part the following:

> ***Our dominance in the automotive space was solidified through the past year where we had earlier confronted doubt about our ability to move effectively beyond the luxury car market for our infotainment systems. That doubt has been erased. With earlier awards to us from PSA, Audi and Chrysler, we established our leadership in the mid-range and entry levels with last year's major awards from UMW, we erased any remaining questions. We are moving from an era in which each new infotainment system represented a virtually original effort with all new R&D to a new era in which the major automotive makers are committing to a common electronics platform, applicable across the full range of car lines.*** That growing set of decisions represents a dramatic shift from the traditional emphasis by automakers on multiple suppliers, to a readiness to commit across the board to a single supplier. That dramatic decision is driven overwhelmingly by new technology, and by the advantages in cost and performance available from a common scalable electronics platform.
>
> Moving into fiscal 2008, our position is further enhanced by our developing technology partnership with Intel and the exclusive opportunity it provides us to employ Intel's powerful new mobile processor in our new designs. Implicit in that application is greater speed, significant improvement in graphic realization, and impressively useful extension of our functionality. We believe that we are in a unique position to move quickly and impressively to build our order book for the second decade of the 21st century.

(Emphasis added).

123. During the same conference call, Dinesh Paliwal, the Company's Chief Executive Officer and President stated in relevant part the following:

> During the past few weeks, I visited several key Harman business locations, and met with several hundred employees in Europe and North America. Although it is still relatively early to form opinions, several positive aspects of this company, which were the basis of my decision to join Harman, have been validated. ***I'm excited -- actually, I'm excited about the opportunities in the premium automotive and professional sectors of our business. I'm equally excited about the growth rates and the growing***

> *market size of the midmarket segments in the developed world, and emerging markets in Eastern Europe and so-called BRIC -- Brazil, Russia, India, and China countries.*
>
> Harman is a potent global brand and I'm determined to penetrate these markets.  I feel pretty strongly about it.  ***Our product portfolio is robust and our R&D in close collaboration with leading customers will keep us ahead of competition.***  Converting these opportunities into profitable business will require a strong management team and peer accountability at all levels.

(Emphasis added).

124.    Further with respect to the increase in operating expenses, defendant Brown stated "fourth quarter operating expenses reflect the costs associated with our determination to pursue vigorously a significant market share in the PND business in Europe.  We spent the money in the fourth quarter which was necessary to cultivate that field for our engagement in the new year." He also stated that the Company's balance sheet was "***strong***" at fiscal year-end and reported that inventory was $453 million.

125.    The statements set forth in paragraphs 122-124, including that the Chrysler MyGIG deal had enabled the Company to establish itself as a leading provider of infotainment systems for the mid-range market; that the increase in operating expenses during the Fourth Quarter of fiscal 2007 was necessary to secure European PND business in fiscal 2008; and that the Company's balance sheet at fiscal year-end was "strong," were materially false and misleading because Defendants knowingly or recklessly failed to disclose material adverse facts about the Company's business and financial prospects, as described in paragraphs 108-110 and 121 above.

126.    In fiscal 2007, upon information and belief, the Company fell well short of the 650,000 PND units that Defendants projected to sell in fiscal 2007.  Upon information and belief, Defendants had no reasonable basis to project these sales, and knowingly or recklessly provided unrealistic projections for sales, operating income and earnings to analysts, shareholders and

Plan Participants.  Defendants knowingly or recklessly stated in a conference call on April 26,

2007 that the Company would sell in the fiscal Fourth Quarter of 2007 alone (April 1, 2007

through June 30, 2007) more than double the 300,000 PND units that it had sold in the first three

quarters of fiscal 2007 (July 1, 2006 through March 31, 2007).  As set forth in paragraph 110

above, defendants S. Harman's and Brown's projections for PND sales lacked a reasonable basis

in fact and were false and misleading because the Company was facing increasing pricing

pressures, increasing competition and was overstocked with obsolete Generation 2 PND units

that were soon going to be superseded by Generation 3 PND units released in August 2007.

127.    On August 29, 2007, the Company filed with the SEC its year-end Form 10-K

with the SEC ("2007 Form 10-K").  In addition to being signed by defendants S. Harman and

Brown, the 2007 Form 10-K was also certified pursuant to Section 302 of the Sarbanes-Oxley

Act of 2002 by defendant S. Harman.  The 2007 Form 10-K was a fiduciary communication and

incorporated into Plan documents.  The 2007 Form 10-K stated in relevant part:

> On April 26, 2007, we entered into an Agreement and Plan of Merger with KHI Parent Inc., a company formed by investment funds affiliated with KKR and GSCP.  The merger agreement provides for the merger of KHI Merger Sub Inc. with and into our company, with our company surviving the merger as a wholly owned subsidiary of Parent. KHI Merger Sub and Parent were formed to acquire our company.

> If the merger agreement is adopted by our stockholders and the merger is completed, our stockholders will be entitled to receive $120.00 in cash, without interest, for each share of Harman common stock owned at the completion of the merger.  As an alternative to receiving the $120.00 per share, our stockholders have the opportunity to elect, on a purely voluntary basis, to exchange some or all of their shares of Harman common stock, on a one-for-one basis, for shares of common stock of Parent.  The right to elect to receive shares of Parent common stock is available to all Harman stockholders and option holders.  However, the number of Parent shares our stockholders and option holders will receive may be less than they request in the event that elections to receive shares of Parent common stock would require Parent to issue more than 8,333,333 shares of Parent common stock.  This number of Parent shares represents approximately 27% of the equity interests in Parent that will be outstanding immediately

following the merger based on the expected equity financing for the merger.  If the total elections for Parent shares exceed that maximum number, then the shares of Parent common stock will be allocated to electing Harman stockholders and option holders on a pro rata basis and the remaining Harman shares and options will be converted into cash.

Our Board of Directors, upon the recommendation of a committee of independent directors, has unanimously approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, determined that the terms of the merger agreement are fair to, and in the best interests of, our company and our stockholders and resolved to recommend that our stockholders vote in favor of the adoption of the merger agreement.

Completion of the merger is subject to the approval of our stockholders and other customary closing conditions, including regulatory approvals and antitrust clearances.  We presently anticipate that the merger will be completed in the fourth quarter of calendar year 2007.

\*        \*        \*

Selling, general and administrative ("SG&A") expenses as a percent of net sales were 23.2 percent in fiscal 2007 compared to 23.3 percent in the prior year.  *Research and Development ("R&D") costs are the largest component of our SG&A expenses*.  In fiscal 2007, R&D costs were $356.7 million or 10.0 percent of net sales.  In fiscal 2006, R&D costs were $302.0 million, or 9.3 percent of net sales.  *The increase was primarily due to cost incurred to support new infotainment system awards from automotive customers.  We expect R&D costs, as a percentage of net sales to decrease approximately 1 percentage point in fiscal 2008 due to the increasing scalability of our infotainment systems and the beginning of production for certain automotive programs*.  SG&A expenses also include employee compensation and benefit costs.  We have recorded stock-based compensation expense under the fair value based method since fiscal 2003, including $15.4 million, $16.6 million and $14.3 million in fiscal 2007, 2006 and 2005, respectively.

\*        \*        \*

Automotive -- Automotive R&D costs were $286.5 million in fiscal 2007, representing 11.5 percent of net sales.  Fiscal 2006 R&D costs were $232.2 million, or 10.4 percent of net sales.  These costs were incurred to develop audio, electronic and infotainment systems for an expanding list of automotive platforms.  *Our infotainment systems are increasingly based on scalable software allowing us to efficiently design systems for luxury, mid-range and entry-level vehicles.*  During fiscal 2007, we received a major infotainment systems award from BMW that will encompass virtually their entire model range.  This sophisticated system will include HD and satellite radio capabilities, second and third dimensional navigation, traffic information, voice recognition, Internet browser and wireless connectivity.  We also develop various systems for Mercedes-

> Benz, Audi, PSA Peugeot Citroen and Porsche in Europe. In the United States and Asia, we develop audio systems for Toyota, Lexus, Hyundai, Chrysler and Harley-Davidson. Automotive SG&A expenses also include restructuring costs of $5.7 million in fiscal 2007 and $7.3 million in fiscal 2006.

(Emphasis added).

128.    In the 2007 Form 10-K, Defendants also stated, "Sales of aftermarket products, particularly PNDs, were very strong during fiscal 2007."

129.    The statements set forth in paragraphs 127-128 regarding total operating income for the Automotive division in fiscal 2007; the Company's purported efficient design for mid-range infotainment systems for Chrysler; the Company's full production at its Washington, Missouri plant in fiscal 2007 and full-capacity operation in fiscal 2008; and "very strong" sales of PNDs during fiscal 2007, were false and misleading because Defendants knowingly or recklessly failed to disclose material adverse facts about the Company's business and financial prospects, as described in paragraphs 108-110 and 121 above. Defendants also failed to disclose the following additional material adverse facts about the Company's MyGIG radios and PNDs:

(a)    Upon information and belief, the Company was burning through cash and experiencing debilitating delays in trying to ramp up its new Missouri plant to manufacture MyGIG radios – which Defendants knew would be sold at a material loss.

(b)    Upon information and belief, the Company was not considered for the MyGIG radio contract for 2010 production of Chrysler's Jeep Grand Cherokee and Durango vehicles because of concerns surrounding the MyGIG radios.

(c)    Upon information and belief, the Company had on hand hundreds of millions of dollars worth of obsolete Generation 2 PNDs that were being superseded by newer Generation 3 PNDs in August 2007.

(d)    Upon information and belief, the Company had missed "aggressive" sales targets of PNDs for the fiscal year ended June 2007 by more than $85 million, which was approximately one-third of Defendants' unreasonably forecasted net sales.

(e)    Upon information and belief, the Company had tried to sell 100,000 of its obsolete PND units at a substantial discount immediately prior to fiscal year-end 2007. The sale was

not pushed through until July 2007 (fiscal First Quarter 2008). Although it generated $24 million in revenues which were recognized in July 2007, upon information and belief, all 100,000 PND units sold in July 2007 were returned to the Company four months later, and the Company took a $24 million loss for return of the sale of obsolete inventory.

130. Further, the 2007 Form 10-K also positively reported on the merger stating in relevant part:

Completion of the merger is subject to the approval of our stockholders and other customary closing conditions, including regulatory approvals and antitrust clearances. *We presently anticipate that the merger will be completed in the fourth quarter of calendar year 2007*.

(Emphasis added).

131. The statement set forth in paragraph 130 that "[w]e presently anticipate that the merger will be completed in the fourth quarter of calendar year 2007" was false and misleading because Defendants knew or recklessly disregarded that the Company's financial condition and operating income and operating margins had materially declined for the reasons described in paragraphs 108-110 and 121 above, and Defendants further knew that the Company had or likely had breached the CapEx covenant of the Merger Agreement and that the Company had or likely had triggered the MAC clause of the Merger Agreement by failing to meet the operating results that Defendants had presented in writing to the Purchasing Companies for fiscal 2007 or fiscal 2008. As set forth above in paragraph 108, Defendants had no reasonable basis in April 2007 to project operating income of $400 million in fiscal 2008.

## THE TRUTH BEGINS TO EMERGE

132. On September 21, 2007, the Company issued a press release entitled *Harman Comments On Previously Announced Merger*. The press release stated in relevant part the following:

Harman International Industries, Incorporated (NYSE: HAR) announced that it was informed this afternoon that Kohlberg

> Kravis Roberts & Co. L.P. (KKR) and GS Capital Partners VI Fund, L.P. (GSCP) *no longer intend to complete the previously announced acquisition of Harman by a company formed by investment funds affiliated with or sponsored by KKR and GSCP. KKR and GSCP have informed Harman that they believe that a material adverse change in Harman's business has occurred, that Harman has breached the merger agreement and that they are not obligated to complete the merger.*   Harman disagrees that a material adverse change has occurred or that it has breached the merger agreement.

(Emphasis added).

133.    On this news, shares of the Company's stock fell from an opening price of $97.70 on September 21, 2007 to close at $85.00 the same day.  Thus, the Company's share price fell more than 12 percent in one day's trading, after having already fallen from the previous day's closing price of $112.34.

134.    On the same day, an article published by *Reuters* stated in relevant part the following regarding the failed merger between Harman and the Purchasing Companies:

> Kohlberg Kravis Roberts & Co LP and Goldman Sachs Group Inc.'s (GS.N: Quote, Profile, Research) private equity arm are worried about certain financial conditions inside Harman International Industries Inc (HAR.N: Quote, Profile, Research), concerns that could threaten the $8 billion deal, a source said on Friday.
>
> *The concerns stemmed less from broad credit market worries and more from internal conditions within the company said the source, who is familiar with the matter but did not want to be identified*.

(Emphasis added).

135.    On that same day, *Reuters* issued another press release stating in relevant part that:

> *Trade in shares of audio equipment maker Harman International Inc (HAR.N: Quote, Profile, Research) was suspended on Friday, pending news from the company*.
>
> The company is the target of an $8 billion takeover, but a source familiar with the matter said the buyers are worried about the company's financial conditions.

(Emphasis added).

136.    Later on that same day, *Reuters* issued yet another article regarding the merger

and, this time, gave additional details regarding the pullout.  The article stated in relevant part the

following:

> NEW YORK (Reuters) -- Harman International Industries Inc.
> (NYSE: HAR -- News) said its private equity buyers are pulling
> out of their $8 billion buyout deal, a severe blow to the company
> whose shares fell more than 25 percent on Friday.
>
> \*      \*      \*
>
> ***But the Harman bailout looks centered on the financial
> conditions of the company itself, not the lending agreement, and
> marks the first time in a two-year private equity acquisition
> frenzy that buyers walked out of a major deal.***
>
> ***Merger arbitrage traders and an analyst said among the hurdles
> Harman faced was rising inventories and declining cash flows
> and sales in the last few quarters.  Traders also said questions
> surfaced recently about Harman's relationship with Daimler-
> Chrysler, a customer for its audio products.***
>
> \*      \*      \*
>
> One analyst said Harman's inventories in February were up 40
> percent, while second-half sales expectations were for an 11
> percent rise.
>
> "When you've got inventories going through the roof, cash flows
> are going to get hit," said Aka Guyer Galperin, an analyst covering
> Harman at independent research firm RiskMetric Group.
>
> The merger proxy does have language in it pertaining to the deal
> being threatened in the event of certain "material adverse" effects
> on Harman.
>
> ***"The company either has to slow production, reduce prices, or
> have inventories remain at elevated levels and that deteriorates
> your cash flow model,"*** Galperin said, adding that personal
> navigation devices for cars were among the items sitting in the
> inventory.
>
> ***Traders said on Friday that a great deal of attention was being
> paid to a filing showing that sales to DaimlerChrysler accounted
> for 25 percent of Harman's total consolidated net sales for the
> fiscal year ended June 30, 2007.  Cerberus Capital recently
> bought Chrysler from Daimler.***
>
> While Harman says in the filing that loss of sales to the customer
> would have a "material adverse effect" on sales, there is no public
> indication that the relationship is in jeopardy.
>
> Harman founder Sidney Harman owned about 5 percent of the
> company's stock at the time of the deal and committed to exchange
> half of his holdings for stub equity.

(Emphasis added).

137. Similarly, on the same day, a *Forbes* article stated in relevant part the following

regarding the failed merger:

### KKR and Goldman Dump Harman

Harman, it's not us, it's you.  This is what the audio-manufacturing firm claims it just heard from would-be buyers KKR and Goldman Sachs when they backed out a deal Friday to buy the firm.  Harman then told the world the news, just slightly ahead of the closing bell at the New York Stock Exchange.

\*       \*       \*

Although the exact reason for the drawback is not known yet, Harman's fourth quarter and full year results did fall short of Wall Street's expectations.  In the fourth quarter Wall Street expected earnings of $1.24 and Harman yielded 98 cents.  Full year of fiscal 2007 Wall Street requested $4.38 and Harman yielded $4.14.

***According to the Associated Press, one anonymous insider said the private equity firms sought to squash the deal over questions about Harman's financial health, not because of any financing difficulties in a tight credit market.  The person said the effort to back out is sincere and not a negotiating tactic.***

Prior to the release, the NYSE had contacted Harman regarding its price drop, and requested it release information pertaining to the drop.

After the company declined the NYSE then released its own report that Harman had denied its request.  Shortly after its denial, Harman changed course and told the NYSE it would make a press release.  In accordance with regulation, the exchange halted the stock from trading.

(Emphasis added).

138.    Then, on September 24, 2007, the Company issued a press release entitled *Harman Provides Guidance For Fiscal 2008.*   The press release stated in relevant part the following:

***The Company expects fiscal 2008 performance to be impacted by a number of factors including increased R&D to support the development of several new infotainment platforms and associated launch costs.  We now expect fiscal 2008 sales to reach $4.1 billion ($3.55 billion in 2007).  The Company expects operating income and diluted EPS before merger related costs to equal or exceed last year's record performance.***  In 2007, operating income was $397 million and diluted EPS were $4.14 adjusted for nonrecurring restructuring charges, merger costs and tax items.

***For the quarter ending September 30, 2007 we estimate net sales of $950 million, operating profit of $40 million and diluted EPS of $0.50 before merger-related costs.  As previously disclosed, the fourth quarter of fiscal 2007 and the first quarter of fiscal 2008***

> ***were affected by increased R&D costs, primarily related to recent
> automotive platform awards.*** We expect substantial margin
> improvements over the course of fiscal 2008 as we work through
> these costs and begin the launching of new infotainment platforms.
>
> "In light of increases in material costs and faster ramp-up of R&D
> resources to work on new business awards, equaling the record
> operating performance of fiscal 2007 is an achievement. The
> benefits of common platform synergy and scalability will be
> realized in fiscal 2009 and beyond. Those benefits will strengthen
> our operating profits," said Paliwal.

(Emphasis added).

139.    On this news, shares of the Company's stock fell to $80.31 on extremely high

volume of over 14.5 million shares.

140.    Therefore, within two trading days, the Company's share price fell approximately

$32 per share, or almost 30 percent, on extremely heavy trading volume.

141.    The statements set forth in paragraphs 132 and 138 regarding Defendants' denial

that they had breached the Merger Agreement; that EPS for fiscal 2008 would be $4.14 per

share; and that R&D expenses would begin to decrease as a percentage of net sales, were false

and misleading because Defendants failed to disclose material adverse facts described above in

paragraphs 108-110, 121 and 129.

142.    On September 25, 2007, *The Wall Street Journal* published an article entitled

*Harman Blames Increased Expenses For Expected 1st-Quarter Earnings Miss*.   The article

stated in relevant part the following:

> Harman International Industries Inc., whose planned $8 billion
> buyout collapsed Friday, said its fiscal first-quarter earnings will
> fall below Wall Street's expectations amid increased research and
> development spending.
>
> The Washington company, which builds audio components for
> home stereos and automobiles, forecast earnings of 50 cents a
> share, before merger-related costs, for the quarter ending Sept. 30
> and sales of $950 million.  The average estimate of analysts
> surveyed by Thomson Financial was for earnings, excluding items,
> of $1.02 a share on revenue of $934.4 million.
>
> Late Friday, Kohlberg Kravis Roberts & Co. and Goldman Sachs
> Group Inc.'s equity arm walked away from their planned $8 billion

leveraged buyout of Harman, saying they found financial conditions inside the stereo maker to be unacceptable.

The buyers also said Harman might have tripped certain covenants in the parties' merger agreement *related to capital spending*, said one person familiar with the matter.

"*The fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards*," said Harman Chief Executive Dinesh Paliwal. "We expect substantial margin improvements over the course of fiscal 2008 as we work through these costs" and launch new products.

(Emphasis added).

143.    On September 27, 2007, the Company held a conference call to discuss its almost completed First Quarter fiscal 2008 financial results and expectations for the full fiscal 2008 year. During the conference call, defendants S. Harman stated in relevant part the following:

Further, as almost all other manufacturing businesses, we have encountered increases in material costs, which placed pressure on margins. During that period, we have built, staffed and opened a new manufacturing facility in the United States and we are ramping up a new plant in China. The startup of those facilities has represented a consequential challenge. The extraordinary time and attention required by senior management to advance and process the KKR/Goldman merger, that entire process with which you are familiar, including the diligence and the negotiations, consumed a significant portion of management's time. The confluence of these events in a six- to eight-month period generated what might be called the perfect storm. *Now that storm is over and we are again in full command of our circumstances and our extraordinary future.*

(Emphasis added)

144.    During the same conference call, Dinesh Paliwal, the Company's Chief Executive Officer and President, stated in relevant part the following:

*In April 2007, we did offer guidance for 2008. For the full year 2008, gross profit is expected to be lower than anticipated in April 2007. On September 24, we reflected the change in modified guidance. The change is due to higher material prices, and more than expected ramp-up costs for the two new manufacturing plants in China and the U.S. These events might have been forecast better and we are improving the way we model and forecast our growing business.*

\*    \*    \*

First quarter fiscal '08 sales are forecast to be $950 million, an increase of 15% compared to the first quarter of fiscal '07. Gross profit is forecast to be approximately 28% of sales, down about 7 points from the prior year's quarter. Operating expenses are forecast to be $227 million, an increase of $27 million. Operating income is forecast to be $40 million, down from $87 million in the first quarter of fiscal '07. Forecast diluted earnings per share before transaction, legal and restructuring costs of $0.50 are $0.35 below last year's first quarter of $0.85. First-quarter sales are projected to increase in each of our three operating segments compared to the prior year. **We expect Automotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment system program and higher PND sales in Europe.**

(Emphasis added)

145. During the same conference call, defendant Brown stated in relevant part the following:

We provided guidance for the first quarter and the full year '08 in our press release of September 24th. I will provide further detail and I note that we have not yet completed the first quarter, therefore, I am reviewing our estimates. . . . **First quarter fiscal '08 sales are forecast to be $950 million, an increase of 15% compared to the first quarter of fiscal '07.** Gross profit is forecast to be approximately 28% of sales, down about 7 points from the prior year's quarter. Operating expenses are forecast to be $227 million, an increase of $27 million. Operating income is forecast to be $40 million, down from $87 million in the first quarter of fiscal '07. Forecast diluted earnings per share before transaction, legal and restructuring costs of $0.50 are $0.35 below last year's first quarter of $0.85. First quarter sales are projected to increase in each of our three operating segments compared to the prior year. **We expect Automotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment system program and higher PND sales in Europe.**

**Excluding R&D, we expect other operating expenses to be higher than last year. In particular, marketing costs will be above the prior year's quarter due to promotions associated with new infotainment system and PND introductions.** There have been several recent developments that have tempered our view of fiscal '08. While our sales growth remains strong, several factors will influence our operating performance.

**Full-year sales for fiscal '08 are forecast to be $4.1 billion, an increase of 16% compared to $3.5 billion in fiscal '07.** We expect each of our three operating segments to produce higher sales than the prior year. Full-year gross profit margin is expected to be 31% of sales, approximately 3 percentage points lower than fiscal '07. Lower gross profit margin is forecasted Automotive, primarily due

to new model and plant launch costs and increases in material prices.

*    *    *

*Finally, we expect fiscal '08 earnings per share before transaction, legal and restructuring costs to meet or exceed the $4.14 reported for fiscal '07. We will now take your questions.*

(Emphasis added)

146.    In addition, in answering a question from an analyst, defendant Brown made the following remarks regarding the Company's strong first quarter fiscal 2008 revenues:

> PETER BARRY: *Just one final for me. I couldn't help but observe that in what is the lowest seasonal quarter for the year historically, the $950 million of revenue expectation is the highest number you've ever achieved.* One, is that observation correct? And to what degree did the spillover of C Class revenues influence that number?
>
> KEVIN BROWN: *Yes, Peter, you are correct that that is a very strong first quarter on the top line for us*, reflecting getting fully up the ramp curve on Mercedes C Class but also reflecting the fact that we are bringing additional business on-stream at Chrysler as *we ramp up our Missouri plant and in the PND business, where we continue the growth and expansion of that business primarily in Europe*.

(Emphasis added)

147.    The statements set forth in paragraphs 142-146, including defendant S. Harman's statement that "The fourth quarter of fiscal 2007 and the first quarter of fiscal 2008 were affected by increased R&D costs, primarily related to recent automotive platform awards"; that margins would increase in fiscal 2008; that the increased costs associated with the new Missouri plant were "over"; that Automotive sales would increase as a result of the "ramp-up of an infotainment system program and higher PND sales in Europe"; that the Company was "bringing additional business on-stream at Chrysler"; and that "growth and expansion" would "continue" in the Company's PND business, were materially false and misleading because Defendants knowingly or recklessly failed to disclose material adverse facts described above in paragraphs 108-110, 121 and 129. Moreover, the developments that had purportedly caused Defendants to "temper"

their guidance for fiscal 2008 had been known to or recklessly disregarded by Defendants throughout the Class Period.

148.    On October 22, 2007, the Company entered into a "Termination and Settlement Agreement" with the Purchasing Companies.  The Termination Agreement states in pertinent part that the Purchasing Companies and their affiliates had determined that they were not obligated to proceed with the Acquisition "based on their belief that a Company Material Adverse Effect has occurred and their belief that the Company has violated the capital expenditures covenant in the Merger Agreement."

149.    On October 25, 2007, the Company issued a press release announcing results for first fiscal 2008 quarter ended September 30, 2007.  The Company announced that net sales for the quarter were $947 million, a 15 percent increase compared to the same period in fiscal 2007.  In addition, the Company announced that excluding merger costs, earnings per diluted share were $0.62 and that all three divisions (Automotive, Consumer and Professional) reported double-digit sales growth for first quarter of fiscal 2008.   Defendant S. Harman and the Company's CEO, Dinesh Paliwal, issued the following comments:

> *We achieved good results during first quarter of fiscal 2008. Sales growth was strong due to the ramp up of an infotainment system for Chrysler and robust sales of personal navigation devices in Europe.  Our initiative to develop cost saving strategies is underway and we expect to gain procurement, engineering and manufacturing efficiencies that will improve margins over the course of this fiscal year*.

(Emphasis added)

150.    On November 9, 2007, the Company filed its quarterly report on Form 10-Q with the SEC for its First fiscal 2008 quarter ended September 30, 2008 ("2008 1Q Form 10-Q").  The 2008 1Q Form 10-Q was signed by defendant Brown and stated in relevant part the following:

> We design, manufacture and market high-quality, high fidelity audio products and electronic systems for the automotive, consumer and professional markets.  We have developed, both

internally and through a series of strategic acquisitions, a broad range of product offerings sold under renowned brand names in our principal markets.  These brand names have a heritage of technological leadership and product innovation.

Our three reportable business segments, Automotive, Consumer and Professional, are based on the end-user markets we serve. Automotive also provides aftermarket products such as personal navigation devices ("PNDs") to customers primarily in Europe. ***Our PNDs leverage many of the successful applications developed by our Automotive segment***.

\*       \*       \*

Automotive -- Net sales for the quarter ended September 30, 2007 increased $81.3 million, or 14 percent compared to the same period last year.  Foreign currency translation contributed approximately $36 million to the increase in sales. Since a significant percentage of our automotive sales are to customers in Europe, Automotive incurs most of our foreign currency translation exposure.  New introductions of infotainment systems including Chrysler's MyGig infotainment systems in North America, the rollout of our first mid-level infotainment system for BMW and the extension of our Multi Media Interface infotainment system for the Audi A4 and A5 were primary factors contributing to the higher sales.  ***A strong demand for Traffic Assist, our European aftermarket PND, also contributed significantly to the increase in sales over the prior year period.***

Consumer -- Net sales for the quarter ended September 30, 2007 increased $26.3 million, or 28 percent, compared to the same period last year.  Foreign currency translation contributed approximately $4 million to the increase in sales compared to the prior year.  ***New product introductions and strong Harman/Kardon and multimedia sales contributed significantly to the sales increase at Consumer.  Higher sales of consumer products for home applications including Harman/Kardon electronics and JBL loudspeakers, multimedia products and our consumer mobile PNDs, each contributed to the sales growth over the prior year period.***

\*       \*       \*

Business Outlook -- Our first quarter sales were a record and reflect continued top-line strength. We believe all three of our core business segments will continue to produce higher sales for the remainder of this fiscal year. For the full fiscal year ending June 30, 2008, we currently believe our net sales will be approximately $4.1 billion, an increase of 16 percent.  We expect earnings per share before transaction, legal and restructuring costs to meet or exceed the prior fiscal year.

(Emphasis added).

151.    The statements set forth in paragraphs 149 and 150, regarding record sales growth

in the First Quarter of fiscal 2008; "robust" PND sales in Europe; "MyGIG infotainment sales to Chrysler as a primary factor contributing to "higher sales" in the First Quarter of fiscal 2008; and projected earnings per share for fiscal 2008 being expected to "meet or exceed" fiscal 2007, were materially false and misleading because Defendants knowingly or recklessly failed to disclose material adverse facts described above in paragraphs 108-110, 121 and 129. Defendants emphasized higher net sales, but operating income for the Automotive division, as reported in the Form 10-Q for First Quarter of fiscal 2008, had decreased to 6.7% of net sales, which was substantially lower than reported operating margins in the approximate amount of 13% in fiscal 2007, and therefore Defendants had no reasonable basis to state in November 2007 that earnings in fiscal 2008 would meet or exceed the prior fiscal year.

### THE TRUTH COMES OUT

152.    On January 14, 2008, prior to the market's opening, the Company issued a press release revising its fiscal 2008 earnings guidance and significantly lowering estimates of earnings per share to between $3.00 and $3.10 per share. The Company's press release entitled *Harman International Revises Fiscal Year 2008 Earnings Guidance* stated in pertinent part:

> **The Company now expects non-GAAP diluted EPS for the 2008 fiscal year to be between $3.00 and $3.10**, before after-tax merger related costs of $8.0 million, or $0.13 per diluted share but including the impact of the Company's ongoing accelerated share repurchase (ASR). Because the accounting impact of previously announced restructuring charges has not been determined, it is not included in the current estimate and, therefore, no GAAP diluted EPS for the fiscal 2008 year is provided.
>
> **The change in guidance was prompted primarily by a major shift in the market for Portable Navigation Devices (PNDs). In recent months this sector has experienced significant pricing pressure that is affecting the entire industry**.
>
> **"While the growth fundamentals of our core business remain sound, the difficult PND environment presents a challenge**. As we have indicated previously, we will be launching a record number of automotive infotainment platforms in 2008. Although, we are not happy with the higher than planned R&D engineering and material costs, the additional investment is necessary to deliver

the new platforms to our valued customers," said Dinesh Paliwal, Vice Chairman and Chief Executive Officer. "Harman continues to have excellent business prospects, and we are confident that we will capitalize on these opportunities as we position our Company to achieve its full potential."

(Emphasis added)

153.    On this news, shares of the Company's stock in heavy trading fell precipitously from the prior trading day's, January 11, 2008, close of $68.97 to close at $43.00 per share, which constituted a 37.65% drop and a four-year low.

154.    The statements in paragraph 152 regarding the Company's guidance for fiscal 2008; "major shift in the market" for PNDs; and "higher than planned R&D engineering and material costs" were false and misleading because Defendants knowingly or recklessly failed to disclose material adverse facts described above in paragraphs 108-110, 121 and 129.

155.    On February 5, 2008, the Company issued a press release announcing financial results for fiscal Second Quarter 2008 ended December 31, 2007 (approximately three months after the Purchasing Companies terminated the Acquisition).  The Company disclosed that its Automotive division's earnings were "under pressure" due to PNDs and that it had suffered a gross margin decline from lower margins on PND products; product mix change, including higher sales of lower-margin infotainment systems for mid-level vehicles; and higher than expected material costs.

156.    Defendants finally admitted that although sales were increasing, the Company's "automotive earnings are under pressure due to portable navigation devices (PND), product mix, and higher engineering and material costs. . . ."  Operating income for the quarter-ended December 31, 2007 was reported at $61 million, a mere 5.7% of sales as compared to $116 million in the same period in 2006, which was 12.4% of sales.  The Company admitted "the decrease in operating income was driven by PND, product mix, and higher engineering, material

and merger costs." Defendants further disclosed that PND sales had fallen by $29 million compared to the same period in 2006 and that PND sales and margins decreased "due to aggressive price reduction by competitors, the delay of new products, and the sale of older products at substantial discounts."

157.    On this news, shares of the Company's stock fell from a closing price on February 5, 2007 of $45.73 to a closing price of $38.70 on February 6, 2007, which was more than a further 15 percent drop in the stock price per share.

158.    On February 11, 2008, in the Company's Form 10-Q for the quarter ended December 31, 2007 (2008 2Q Form 10-Q"), Defendants repeated the disclosures from the earnings press release regarding PND sales and margins and further disclosed more specifically the reasons why operating income and margins had declined in the first six months of fiscal 2008 (July 1, 2007 through December 31, 2007), as follows:

> For the three and six month periods the gross margin decline was the result of lower margins on PND products, product mix change, including higher sales of lower margin infotainment systems for mid-level vehicles and higher than expected material costs. The reduction of the PND margin is the result of three primary factors: a significant decline in average market prices, delayed introductions and lower volumes of new generation products and the inventory clearance of prior generation models at a loss.

> \*       \*       \*

> In January, we announced updated earnings guidance for the fiscal year, which included a decrease in our expected operating profit of more than $100 million. The primary driver of this deterioration is the PND market, with higher-than-expected engineering and material costs also contributing.

> The PND margin outlook for the 2008 fiscal year has declined by about $60 million. This is divided almost equally across three factors: a significant decline in average market prices; delayed introductions and lower volumes of new generation products; and the inventory clearance of prior generation models at a loss.

159.    Defendants also admitted in the 2008 2Q Form 10-Q that its mid-level infotainment system for Chrysler, *i.e.*, the MyGIG radio, was unprofitable as follows:

> Higher sales of lower margin infotainment systems and higher than expected material costs are both exemplified in our infotainment program with Chrysler. This infotainment program award included the supply of both a high- and a mid-level system. ***While the Chrysler infotainment program as a whole is slightly profitable, the mid-level system is not.***

(Emphasis added).

160.    On May 6, 2008, the Company issued a press release entitled *Harman International Reports Third Quarter Results*.  It was in this press release that the Company announced results for the third quarter ending March 31, 2008.

161.    Further, on May 6, 2008, the Company announced in a Form 8-K filed with the SEC that defendant Brown informed the Company on April 30, 2008 that he intended to resign as Executive Vice President, Chief Financial Officer and Assistant Secretary of the Company. His resignation from these offices was effective on May 31, 2008.

162.    During the Class Period, Defendants knowingly or recklessly omitted material adverse information regarding PND and MyGIG sales and margins from their SEC filings, press releases and other statements and also knowingly and recklessly omitted material information regarding the risks posed by these undisclosed material adverse effects on the Company's proposed acquisition by the Purchasing Companies.  All of the undisclosed events were known to or recklessly disregarded by Defendants during the Class Period and were knowingly or recklessly concealed from the Purchasing Companies, shareholders, and Plan Participants.

## THE LAW UNDER ERISA

163.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

164.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be

personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

165.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

166.    These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law."  They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in Harman Stock, to ensure that each investment is a suitable option for the Plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)    A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that

silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

167.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

168.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

### DEFENDANTS' FIDUCIARY STATUS

169.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

170.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the

management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

171.    During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in Company Stock. Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and Plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

172.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSES OF ACTION

### COUNT I

173.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

174.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

175.    As alleged above, Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company Stock.

176.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that

investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in Harman Stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

177.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

178.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's Participants and beneficiaries, from suffering losses as a result of the Plan's investment in Harman Stock. Further, given that such a high concentration of the assets of the Plan was invested in the stock of a single company (Harman), Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments.

179.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

180.    Defendants breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plan's assets with respect to offering Company Stock as an investment option in the Plan; enabling Defendants' failure to prudently manage the Plan's assets with respect to the Plan's investments; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

181.    Specifically, at least some of the defendants had actual knowledge of Harman's corporate malfeasance and questionable reporting and business.  In addition, in light of their positions as high-ranking officers at the Company, Defendants had/should have had constructive knowledge of these activities.

182.    Despite this knowledge, Defendants participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing Participants that the Plan's holdings of Harman Stock were not being prudently managed.  They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in Harman Stock, despite inarguably having knowledge of such breaches.

183.    Furthermore, through their own failure to prudently and loyally manage the Plan's investment in Harman Stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, Defendants enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in Harman Stock.

184.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.  Pursuant

to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

185.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

186.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

187.    As alleged above, the scope of Defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to Participants regarding the Plan and assets of the Plan.  In addition, Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plan.

188.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan, this duty applies to all of the Plan's investment options, including investment in Harman Stock.

189.    Because a substantial percentage of the Plan's assets were invested in Harman Stock, and Defendants chose to invest overwhelmingly in Harman Stock, such investment carried with it an inherently high degree of risk.  This inherent risk made Defendants' duty to

provide complete and accurate information particularly important with respect to Company Stock.

190.    Specifically, Harman, through its officers and directors issued a multitude of false and misleading statements through SEC filings and press releases regarding value of Harman Stock and the financial health of the Company.

191.    Upon information and belief, such communications were disseminated directly to all Participants, which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports furnished by Harman, through its officers and directors.  In addition, upon information and belief, the Company communicated directly with all Participants regarding the merits of investing in Harman Stock in company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding Harman Stock as required by ERISA.

192.    In addition, Defendants were responsible for providing Participants in the Plan with investment education and communication.  Defendants, however, failed to disclose any information to Plan Participants regarding Harman's deceitful business practices and how these activities adversely affected Company stock as a prudent investment option under the Plan.  Defendants thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plan.

193.    Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding Harman Stock, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information

regarding the soundness of Harman Stock and the prudence of investing retirement contributions in the Company's stock.

194.    These failures were particularly devastating to the Plan and the Participants, as a significant percentage of the Plan's assets were invested in Harman Stock during the Class Period and, thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets.

195.    In addition, Defendants knew or should have known that information they possessed regarding the true condition of Harman would have an extreme impact on the Plan. Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

196.    As a consequence of the failure of Defendants to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Harman Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, Harman Stock was an inherently unsuitable and inappropriate investment option for their Plan accounts. Had accurate information been provided, Participants could have protected themselves against losses accordingly, and consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

197.    As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If these Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary

duties alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

198.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

199.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

200.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  At all relevant times, as alleged above, the scope of the fiduciary responsibilities of Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries.  The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. The monitoring fiduciaries, Defendants had the duty to:

(a)    Ensure that the appointed Plan fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, as noted above, and the behavior of the Plan's Participants;

(b)    Ensure that the appointed Plan fiduciaries are provided with adequate financial resources to do their job;

(c)    Ensure that the appointed Plan fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)    Ensure that the appointed Plan fiduciaries have ready access to outside, impartial advisors when needed;

(e)    Ensure that the appointed Plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(f)    Ensure that the appointed Plan fiduciaries report regularly to the Company, the Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

201.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

202.    Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed Plan fiduciaries were given adequate information about the Company's business problems alleged above, which made Company Stock an imprudent investment, which was necessary for them to perform their duties of overseeing the Plan's investments, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities.

203.    Defendants also breached this duty by not properly disclosing information that they knew or should have known about the Company's improper business practices to the Trustee.  The Trustee is responsible for investing and managing assets of the Plan.  However, in doing so, the Trustee shall be subject to the direction and guidance of Harman.

204.    Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (a) imprudently allowing the Plan to continue offering Harman Stock as an investment alternative for the Plan, and (b) continuing to invest the assets of the Plan in Harman Stock when it no longer was prudent to do so.  Despite this knowledge, Defendants failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of these fiduciaries' failures.

205.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the appointed Plan fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

206.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

207.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C., § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

208.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

209.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

210.    ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

211.    Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company Stock, before the interests of the Plan and its Participants and beneficiaries.  These conflicts of interest put Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives (and Harman stockholders), and the interests of the Plan's Participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

212.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Harman Stock; failing to notify appropriate federal agencies, including the SEC of the facts and transactions which made Harman Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Company Stock.

213.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

214.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

215.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

216.    As alleged herein, Harman, through its officers and directors, withheld material information from the Plan's Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed to these Defendants as a matter of law.  In addition, as alleged herein on information and belief, Harman and the other defendants participated in and/or knew about the Company's misrepresentations regarding the Company's financial condition.  Thus, these defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of Harman Stock as an investment for the Participants' retirement assets.

217.    Despite this knowledge, Defendants knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of

Harman Stock during the Class Period.  They did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in Harman Stock in the manner alleged herein in violation of ERISA § 405(a)(l)(A).  In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in Harman Stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

218.    In further violation of ERISA § 405(a)(l)(C), Defendants also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole.  Instead, they compounded the problem by downplaying the significance of Harman's problems and further concealing such practices from Participants and the market as a whole.

219.    In addition, Defendants enabled the imprudent asset management decisions of any and all other Defendants -- including any appointed Plan fiduciaries -- who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's improper practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in Harman Stock.  In so doing, these Defendants breached ERISA § 405(a)(l)(B).

220.    Further, through their failure to properly and effectively monitor and remove those fiduciaries whose performance was inadequate as alleged above, Defendants enabled these appointed Plan fiduciaries' imprudent management of the Harman Stock in the Plan.

221.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

222.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

223.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

224.    To the extent that Harman is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Harman knowingly participated in the breaches of those defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

225.    Harman benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by contributing Harman Stock to the Plan while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of Harman providing the market with materially misleading statements and omissions.  Accordingly, Harman may be required to disgorge this benefit or a constructive trust

should be imposed on treasury shares of Harman Stock that would have been contributed to the Plan, but for Harman's participation in the foregoing breaches of fiduciary duty.

## CAUSATION

226.    The Plan suffered millions of dollars in losses in plan benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in Harman Stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

227.    Defendants are responsible for losses in Plan benefits caused by the Participants' direction of investment in Harman Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants concealed material, non-public facts from Participants, and provided inaccurate, incomplete and materially misleading information to them regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle.  As a consequence, Participants could not exercise independent control over their investments in Harman Stock, and Defendants remain liable under ERISA for losses caused by such investment.

228.    Defendants are also responsible for all losses in Plan benefits caused by the investment of the Plan's Company Contributions in Harman Stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

229.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in

Harman Stock, eliminating such Company Stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of Harman Stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

230.   Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiff relied to their detriment on the misstatements and omissions that Defendants made to Plan Participants.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

231.   Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Harman Stock during the Class Period.   As a consequence of Defendants' breaches, the Plan suffered significant losses.

232.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes Asuch other equitable or remedial relief as the court may deem appropriate . . . ."

233.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable

alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been, properly administered.

234.   Plaintiff and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

235.   Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## ERISA SECTION 404(c) DEFENSE INAPPLICABLE

236.   ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from Participants' exercise of control over investment decisions. In order for § 404(c) to apply, Participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

237.   Those provisions were not complied with here as, among other reasons, instead of taking the necessary steps to ensure effective participant control by complete and accurate disclosure of material information, Defendants did exactly the opposite. As a consequence,

Participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in Harman Stock as a result of their investment directions, and Defendants remained entirely responsible for losses that result from such investment.

238.    Because ERISA § 404(c) does not apply here, Defendants' liability to the Plan, Plaintiff and the Class for relief stemming from Participants' decisions to invest contributions in Harman Stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

239.    Furthermore, under ERISA, fiduciaries -- not Participants -- exercise control over the selection of investment options made available to Participants.  Thus, whether or not Participants are provided with the ability to select among different investment options, and whether or not Participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected by the fiduciaries and presented as an option to Participants, and as a result of such action the Plan suffers a loss.  Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plan.

240.    Finally, Defendants remain liable for Plan losses that pertain to Harman Stock acquired by the Plan with employer contributions, as Participants did not exercise any control.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C. An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

D. Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E. An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F. An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Harman Stock;

G. Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

H. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I. An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J. An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated: June 2, 2008

**TYDINGS & ROSENBERG LLP**


By: _/s/_____
    John B. Isbister (Bar No. 277418)
    Toyja E. Kelley (Bar No. 482977)
    100 East Pratt Street
    Baltimore, MD 21202
    Telephone: (410) 752-9700
    Facsimile: (410) 727-5460
    Email: (jisbister@tydingslaw.com)
    Email: (tkelley@tydingslaw.com)

    **GAINEY & McKENNA**
    Thomas J. McKenna, *Pro Hac* Motion Pending
    295 Madison Avenue
    New York, NY 10017
    Telephone: (212) 983-1 300
    Facsimile: (212) 983-0383
    Email: (tjmckenna@gaineyandmckenna.com)

    *Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 2nd day of June 2008 that a copy of the foregoing

Amended Class Action Complaint For Violations of the Employee Retirement Income Security

Act was filed and served electronically via the ECF/CM system and emailed and sent via

certified mail to:

Robert C. Micheletto
**JONES DAY**
222 East 41st Street
New York, New York  10017
Tel. No.:  (212) 326-3690
Fax. No.: (212) 755-7306
rmicheletto@jonesday.com

**Attorneys for Defendants**


/ s /_____
Toyja E. Kelley