**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
PATRICK RUSSELL,                 )
)
      Plaintiff,              )
)
        v.                   )    Civil Action No. 07-2212 (RWR)
)
HARMAN INTERNATIONAL             )
INDUSTRIES, INCORPORATED,        )
et al.,                          )
)
      Defendants.             )
_____)

### MEMORANDUM OPINION

Plaintiff Patrick Russell, a participant in the Harman Retirement Savings Plan (the "Plan") established by Harman International Industries, Incorporated ("Harman"), brings on his own behalf and on behalf of others similarly situated this putative class action against Harman, Dr. Sidney Harman, Sandra Buchanan, Kevin Brown, Gregory Henry, Chet Simon, Jeffrey Curtis, Robert Ryan, the Harman Administrative Committee, the Harman Investment Committee, the Harman Pension Committee, and unknown fiduciary defendants 1-10, seeking damages and declaratory and injunctive relief for breach of fiduciary duties in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. The defendants have moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim arguing that Russell is contractually barred from bringing this action. Because Russell released his

-2-

individual ERISA claims alleged in his amended complaint and
lacks Article III standing to bring ERISA claims on behalf of
Plan participants, the defendants' motion to dismiss, treated as
a motion for summary judgment, will be granted.

BACKGROUND

Harman develops, manufactures, and markets audio products
and electronic systems.  Am. Compl. ¶ 14.  Russell is a former
Harman employee and a participant in the Plan, an employee
pension benefit plan.  Id. ¶¶ 13, 37.  Russell alleges that each
of the defendants was a fiduciary of the Plan under ERISA.  Id.
¶ 54.  The Plan is a participant-directed defined contribution
plan.[1]  As such, participants in the Plan choose from among a
number of pre-selected investment options where to invest the
money in their 401(k) accounts.  See id. ¶¶ 40-41.  One of the
investment options available under the Plan is Harman common
stock.  Id. ¶¶ 49-51.  During the class period, April 26, 2007

---

[1] A "defined contribution plan" or "individual account plan"
is "a pension plan which provides for an individual account for
each participant and for benefits based solely upon the amount
contributed to the participant's account, and any income,
expenses, gains and losses, and any forfeitures of accounts of
other participants which may be allocated to such participant's
account."  29 U.S.C. § 1002(34).  In a defined contribution plan
the employer's contribution for each participant is based on the
employer's profits.  "Having made that contribution, the
employer's obligation to fund is over because the employee is not
guaranteed a particular benefit, just a specified input.  In a
defined contribution context, the participant's ultimate economic
entitlement is the amount to which the defined contributions for
her, plus earnings, grow or shrink."  See Edward A. Zelinsky, The
Defined Contribution Paradigm, 114 Yale L.J. 451, 455 (2004).

-3-

through the time of the complaint, "the Plan invested in Harman common stock." Id. ¶ 2.

On April 26, 2007, Harman issued a press release announcing that Harman had agreed to be acquired by Kohlberg Kravis Roberts & Co. L.P. ("KKR") and GS Capital Partners ("GSCP") and that "[u]nder the terms of the agreement, Harman stockholders [would] be entitled to receive $120 in cash for each share of Harman common stock they [held]". Id. ¶ 101. Russell alleges that in the press release and a conference call the same day, the defendants made several materially false and misleading disclosures regarding Harman's financial conditions. For example, Sidney Harman stated that Harman's inventory of personal navigation devices ("PND") would decrease as sales increased throughout 2007. Id. ¶¶ 104, 107. He also projected that Harman would have opportunities to expand its sales of infotainment systems, such as the MyGIG radio, in 2007 and 2008. Id. ¶¶ 104-07, 109. Russell contends that contrary to Sidney Harman's positive predictions, the MyGIG radio and the PND were "[a]t the center of the Company's deteriorating financial condition." Id. ¶ 93. Russell further alleges that the defendants continued to make false and misleading statements regarding these products, Harman's capital expenditures, and Harman's financial condition. Id. ¶ 94. Russell claims that as a result of the defendants' false and misleading statements, KKR and GSCP decided not to

-4-

acquire Harman, causing the price of Harman common stock to drop nearly 30 percent in two trading days.  Id. ¶¶ 132-40.

Russell's amended complaint charges that the defendants breached their fiduciary duty of loyalty by failing to disclose complete and accurate financial information about Harman and their fiduciary duty of prudence by allowing Plan members to invest in Harman common stock despite Harman's poor financial condition (Counts One and Two).  The amended complaint also charges that the defendants breached their fiduciary duty to monitor other fiduciaries (Count Three) and avoid conflicts of interest (Count Four).  It further charges that all defendants are responsible for the fiduciary breaches of their co-fiduciaries (Count Five).  The amended complaint charges in the alternative that if Harman is found not to be a fiduciary, Harman is still liable for knowingly participating in the breaches of other fiduciaries (Count Six).[2]

---

[2] The defendants argue that Counts Three through Six are "derivative claims" because they "all depend on a finding that there is an underlying breach of fiduciary duty."  Defs.' Mot. to Dismiss the Am. Class Action Compl., Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss the Am. Class Action Compl. at 39.  Where a claim is predicated on the existence of an underlying breach of fiduciary duty, the claims rise and fall together.  See In re RadioShack Corp. ERISA Litig., 547 F. Supp. 2d 606, 616 (N.D. Tex. 2008) (dismissing duty to monitor, co-fiduciary liability, and conflict of interest claims after dismissing underlying breach of fiduciary duty claims); Edgar v. Avaya, Inc., No. Civ. A. 05-3598 SRC, 2006 WL 1084087, at *11-12 (D.N.J. Apr. 25, 2006) (dismissing duty to monitor and co-fiduciary liability claims after finding that plaintiff's complaint failed to state a claim for breach of fiduciary duty), aff'd, 503 F.3d 340 (3d Cir.

-5-

The defendants move to dismiss the complaint under Rule 12(b)(6) on several grounds including that Russell is contractually-barred from bringing this suit because he expressly waived his right to bring ERISA claims against the defendants in a severance agreement. Defs.' Mot. to Dismiss the Am. Class Action Compl. ("Defs.' Mot."), Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss the Am. Class Action Compl. at 40-41.

On June 19, 2007, Russell executed a severance agreement (the "Agreement") with Harman. Under the Agreement, Russell agreed to release Harman from any claim of any kind that had arisen on or before June 19, 2007. Specifically, the Agreement states:

> Employee . . . releases and forever discharges the Company, its affiliates, and all of their agents (collectively, the "Released Parties") of and from any Claim (as defined below) which have arisen on or before [June 19, 2007]. . . . As used in this Agreement, the term "Claim" means any claim of any kind, including but not limited to claims, wages, demands, rights, liens, agreements, contracts, covenants, actions, suits, causes of action, obligations, debts, costs, expenses, attorneys' fees, damages, judgments, orders and liabilities of whatever kind or nature in law, equity or otherwise, whether now known or unknown, suspected or unsuspected and whether or not concealed or hidden, fixed or contingent . . . . The Claims released by this Agreement include, but are not limited to, . . . any Claims constituting, arising out of, based upon, or relating to . . . the Employee Retirement Income Security Act[.]

---

2007). Thus, if Counts One and Two are dismissed, Counts Three through Six must also be dismissed.

-6-

Defs.' Mot., Decl. of Jennifer Haring, Ex. 1 ("Agreement")
¶ 2(a).  In exchange, Harman received several benefits including
severance payments beyond what Russell would have been entitled
to receive otherwise.  Id. ¶ 1(a).

<u>DISCUSSION</u>

A district court can dismiss a complaint under Rule 12(b)(6)
when the defendant shows that the plaintiff "fail[s] to state a
claim upon which relief can be granted[.]"  Fed. R. Civ. P.
12(b)(6).  However, "[w]hen 'matters outside the pleadings are
presented to and not excluded by the court' on a motion to
dismiss under Rule 12(b)(6), 'the motion must be treated as one
for summary judgment.'"  <u>Highland Renovation Corp. v. Hanover</u>
<u>Ins. Grp.</u>, 620 F. Supp. 2d 79, 82 (D.D.C. 2009) (quoting Fed. R.
Civ. P. 12(d)).  Since the defendants rely on materials outside
the pleadings, such as the Agreement, the motion to dismiss will
be treated as a motion for summary judgment.

Summary judgment may be granted when "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(c); <u>see also</u> <u>Moore v. Hartman</u>, 571 F.3d 62, 66 (D.C. Cir.
2009).  A dispute is "genuine" "where the 'evidence is such that
a reasonable jury could return a verdict for the non-moving
party,' a situation separate and distinct from a case where the
evidence is 'so one-sided that one party must prevail as a matter

of law.'" <u>Dozier-Nix v. District of Columbia</u>, 851 F. Supp. 2d 163, 166 (D.D.C. 2012) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law[.]" <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing <u>Anderson</u>, 477 U.S. at 248). To survive a motion for summary judgment, the nonmoving party "must provide evidence showing that there is a triable issue as to an element essential to that party's claim." <u>Arias v. DynCorp</u>, Civil Action No. 01-1908 (RWR), 2013 WL 864566, at *3 (D.D.C. Feb. 6, 2013) (internal quotation marks omitted); <u>see also</u> <u>Moore</u>, 571 F.3d at 66. "In considering a motion for summary judgment, [the court should draw] all 'justifiable inferences' from the evidence . . . in favor of the nonmovant." <u>Cruz-Packer v. District of Columbia</u>, 539 F. Supp. 2d 181, 189 (D.D.C. 2008) (quoting <u>Anderson</u>, 477 U.S. at 255).

I.   INDIVIDUAL CLAIMS

The defendants allege that Russell is barred from bringing his individual ERISA claims because in the Agreement he waived his ERISA claims that arose before June 19, 2007. Because a release is an affirmative defense, the defendants bear the burden of establishing that Russell waived his individual ERISA claims. <u>See</u> <u>Tech 7 Sys., Inc. v. Vacation Acquisition, LLC</u>, 594 F. Supp. 2d 76, 80 (D.D.C. 2009) (citing <u>Gull Airborne Instruments, Inc.</u>

-8-

v. Weinberger, 694 F.2d 838, 843 (D.C. Cir. 1982)); see also
Anzueto v. Wash. Metro. Area Transit Auth., Civil Action No.
89-553 (JGP), 1992 WL 613240, at *2 (D.D.C. June 9, 1992).  To
prevail, the defendants must show (1) that Russell's waiver of
his ERISA claims was valid and (2) that the claims in Russell's
amended complaint arose before June 19, 2007.

   A.   Validity of waiver

       1.   Void as a matter of law

As a preliminary matter, Russell argues that the Agreement
is void as a matter of law because, under ERISA § 410(a), 29
U.S.C. § 1110(a), "any provision in an agreement or instrument
which purports to relieve a fiduciary from responsibility or
liability for any responsibility, obligation, or duty [is] void
as against public policy."[3]  29 U.S.C. § 1110(a).  "As the
legislative history of this provision makes clear, . . .

---

[3] Russell also asserts that the release is invalid because
he cannot release his future, unknown ERISA claims.  See Pl.'s
Mem. of Law Opposing Defs.' Mot. to Dismiss the Class Action
Compl. at 42.  The Agreement, however, expressly states that
Russell is not waiving future claims.  See Agreement ¶ 2(b)
(stating that "in executing this Agreement, [Russell] is *not*
waiving rights or claims that may arise *after* the date that this
Agreement becomes effective" (emphasis added)).  Moreover, the
cases Russell cites do not support the assertion that employees
can never waive future, unknown ERISA claims.  See, e.g., Wright
v. Sw. Bell Tel. Co., 925 F.2d 1288, 1292-93 (10th Cir. 1991)
(finding that an employee had not knowingly and voluntarily
waived his right to bring a future, unknown ERISA claim against
his employer because the release language did not "purport[] to
cover all future claims including claims of which neither party
was aware when executing the release").

exculpatory provisions which relieve a fiduciary from liability for breach of the fiduciary responsibility are to be void and of no effect." Chicago Bd. Options Exch., Inc. v. Conn. Gen. Life Ins. Co., 713 F.2d 254, 259 (7th Cir. 1983) (internal quotation marks omitted). However, "courts generally have not read ERISA § 410(a), 29 U.S.C. § 1110(a), as creating a blanket prohibition of the release of claims for breach of fiduciary duty." Boeckman v. A.G. Edwards, Inc., 461 F. Supp. 2d 801, 808 (S.D. Ill. 2006) (finding that a broad release of employment liability for "claims arising out of or related to" ERISA in a severance agreement was not void under ERISA § 410(a)). Instead, courts do not apply ERISA § 410(a) to releases that "merely settle[] an individual dispute without altering a fiduciary's statutory duties and responsibilities." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 593 (3d Cir. 2009); cf. Leavitt v. Nw. Bell Tel. Co., 921 F.2d 160, 161-62 (8th Cir. 1990) (explaining that a settlement of breach of fiduciary duty claims, unlike an "agreement or instrument" covered in 29 U.S.C. § 1110(a), "does not relieve a fiduciary of any responsibility, obligation, or duty imposed by ERISA; instead, it merely settles a dispute that the fiduciary did not fulfill its responsibility or duty on a given occasion").[4] Here, the Agreement does not purport to

---

[4] Russell cites in his opposition to the defendants' supplemental memorandum three cases that purportedly support his assertion that the Agreement is void as a matter of law. The

-10-

relieve the defendants of all of their fiduciary duties.

Instead, it releases the defendants from liability for any ERISA

violations that had arisen at the time the Agreement became

effective.  Accordingly, ERISA § 410(a) does not render Russell's

release of his individual ERISA claims void as against public

policy.

2.  Knowing and voluntary waiver

In general, an employee may sign a general release of his

ERISA claims upon termination of his employment.  See Howell v.

Motorola, Inc., 633 F.3d 552, 558-59 (7th Cir. 2011); Schering

Plough, 589 F.3d at 593-94.  A release of one's ERISA claims is

valid if it is knowing and voluntary.  Howell, 633 F.3d at 559

(citing Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 n.15

---

only case that considers ERISA § 410(a) does not support
Russell's argument that a release of one's individual ERISA
claims that have arisen by the date the release becomes effective
is void as a matter of law.  Cf. IT Corp. v. Gen. Am. Life Ins.
Co., 107 F.3d 1415, 1418 (9th Cir. 1997) (holding that the
company hired to administer the plaintiff's ERISA plan could not
generally exonerate itself from any liability in its
administration of the plan).  Likewise, Russell has not
established that the other two cases he cites support a finding
that the release in the Agreement is void under ERISA § 410(a).
See Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan,
935 F.2d 1360, 1366 (2d Cir. 1991) (holding that "an individual
generally may waive the right to participate in a pension plan
governed by ERISA" and rejecting an argument that allowing an
individual to waive his right to participate in an ERISA pension
plan would allow employers to avoid ERISA pension plan
standards); Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493
U.S. 365, 375-77 (1990) (interpreting literally and strictly
ERISA's statutory prohibition on assignment or alienation of
pension benefits).

(1974)); <u>Rodriguez-Abreu v. Chase Manhattan Bank, N.A.</u>, 986 F.2d

580, 587 (1st Cir. 1993); <u>cf.</u> <u>United States v. Trucking</u>

<u>Employers, Inc.</u>, 561 F.2d 313, 318 (D.C. Cir. 1977) (stating that

a waiver of one's rights to bring a claim under Title VII is

valid only if it is "knowing and voluntary").[5]

To determine whether a waiver is knowing and voluntary,

several circuits have adopted a totality of the circumstances

standard.  In those circuits, courts consider factors such as:

> "1) the plaintiff's education and business experience,
> 2) the amount of time the plaintiff had possession of
> or access to the agreement before signing it, 3) the
> role of plaintiff in deciding the terms of the
> agreement, 4) the clarity of the agreement, 5) whether
> the plaintiff was represented by or consulted with an
> attorney, and 6) whether the consideration given in
> exchange for the waiver exceeds employee benefits to
> which the employee was already entitled by contract or
> law."

<u>Bormann v. AT&T Communic'ns, Inc.</u>, 875 F.2d 399, 403 (2d Cir.

1989) (internal quotation marks omitted) (quoting <u>EEOC v. Am.</u>

<u>Express Publ'g Corp.</u>, 681 F. Supp. 216, 219 (S.D.N.Y. 1988)).

Although Russell proceeds as though the totality of the

circumstances standard applies in this case, the D.C. Circuit has

---

[5] "Courts of appeals routinely apply the same standards to
evaluate Title VII claims as they do . . . ERISA claims." <u>Brown
v. Brody</u>, 199 F.3d 446, 456 n.10 (D.C. Cir. 1999), <u>abrogated on
other grounds by</u> <u>Steele v. Schafer</u>, 535 F.3d 689 (D.C. Cir.
2008); <u>see also</u> <u>Laniok</u>, 935 F.2d at 1365 (explaining that, while
not identical, "the right of an individual to participate in a
pension plan is analogous to the rights given up when ADEA or
Title VII claims are waived" and finding "the reasoning of the
ADEA and Title VII waiver cases instructive" in an ERISA case).

-12-

never adopted that standard and, in the analogous Title VII
context, stated that a waiver is knowing and voluntary if it is
"'executed freely, without deception or coercion with a full
understanding of what rights are being waived.'" Trucking
Employers, 561 F.2d at 318 (quoting Garrett v. Moore-McCormack
Co., 317 U.S. 239, 248 (1942)). For a waiver to be knowing, the
employee must "know[] what he is receiving in return." See id.
In determining whether a waiver was voluntary, courts may
consider the "adequacy of the consideration and the nature of
the . . . legal advice available to the [employee] at the time of
signing the release." See Garrett, 317 U.S. at 248.

"[I]t is well established that a person has a duty to read a
contract before he signs it. If he had the opportunity to read
it, he is bound by its terms regardless of whether he thought he
was signing an actual contract." Anzueto v. Wash. Metro. Area
Transit Auth., 357 F. Supp. 2d 27, 30 (D.D.C. 2004).[6] Thus, if
the contract states what the employee is waiving and what the
employee is receiving in return for that waiver, "in the absence
of ambiguous language not susceptible to a clear and definite
understanding, or a mutual mistake by the parties," id. at 30-31,

---

[6] The Agreement here states that "[a]ll parties represent
that they have read this Agreement and fully understand all of
its terms[.]" Agreement ¶ 16.

-13-

the waiver was knowing.[7]  Trucking Employers, 561 F.2d at 318;

Anzueto, 357 F. Supp. 2d at 30-31.  For example, in Anzueto, the

court found that the contract was sufficiently clear and that the

plaintiff had knowingly waived his right to pursue Title VII

claims.  There, the waiver highlighted the section title, "Waiver

and Release of Claims," by capitalizing the title and putting the

words in bold and underlining them.  Anzueto, 357 F. Supp. 2d at

30-31.  The relevant part of the waiver read: "I [hereby] release

and forever discharge WMATA . . . from any and all grievances[,]

. . . contracts, agreements[,] . . . claims, demands, damages,

actions, and causes of action of every kind . . . which arise out

of, or are in any way related to, my employment relationship with

[the employer] and the termination of that relationship."  Id. at

31 (alterations in original).  The Anzeuto court found that this

language was "very clear and the average person reading it would

undoubtably be able to comprehend the consequences of signing

such a document."  Id.

     Here, the Agreement highlights the consideration Russell

would receive for signing the agreement by introducing the

section with "Consideration" and underlining the title.  The

Agreement proceeds to describe in clear language the

---

     [7] Neither side here argues that it "entertained a material
mistake of fact that went to the heart of the bargain."  See
Bituminous Coal Operators' Ass'n, Inc. v. Connors, 867 F.2d 625,
635 (D.C. Cir. 1989).

consideration Harman would provide Russell.  See Agreement ¶ 1.

For example, the Agreement states that Russell will receive

"severance payments in an amount equal to [his] regular salary"

and stipulates that "these payments are more than what [Russell]

would otherwise be entitled to receive."  Id. ¶ 1(a).  A section

of the Agreement bearing the underlined title "Release of Known

and Unknown Claims," states that Russell "releases and forever

discharges the Company . . . of and from . . . any claim of any

kind . . . arising out of, based upon, or relating to . . . the

Employee Retirement Income Security Act."  Id. ¶ 2(a).  The

Agreement also states that Russell had seven days to consider

whether or not to sign the Agreement, and advises him that "he

should consult an attorney prior to signing it."  Id. ¶ 15.

Moreover, the Agreement states that Russell "has entered into and

executed [the] Agreement knowingly and voluntarily," id. ¶ 2(b),

that the "Agreement is written in a manner [that Russell]

understands," id., and affirms that Russell "executed th[e]

Agreement without coercion or duress of any kind," id. ¶ 16.

Russell argues generally that the defendants have failed to meet

their burden to show that the Agreement was knowing and

voluntary, but Russell has not shown how the defendants' evidence

is insufficient to find a knowing and voluntary waiver.  Because

the Agreement states clearly the consideration Russell received

for entering into the Agreement, highlights the rights that

Russell released, uses clear and precise language to describe the scope of that release, provides that Russell had time to consider the Agreement, and counsels him to consult an attorney, the waiver was knowing and voluntary.

Even under the totality of the circumstances standard, this waiver was knowing and voluntary.  In Adams v. Phillip Morris, Inc., 67 F.3d 580 (6th Cir. 1995), the Sixth Circuit found that an employee's agreement to waive his Title VII and age discrimination claims was knowing and voluntary.  The court found that the employee was aware of his rights, the waiver was plain, unambiguous, and easy to understand,[8] and the employee was given five days to consider whether to sign the waiver.  Id. at 583. He was also advised to consult an attorney before doing so.  Id. The employee also received a more "attractive severance package" than he would have been entitled to otherwise.  Id.  Here, the Agreement is silent as to whether Russell was aware of his ERISA rights.  However, the other factors show that the waiver was

---

[8] The waiver provided that the employee
for and in consideration of severance pay in the amount
of $32,767.00 payable in form of salary continuation
. . . and a lump-sum payment of 3,542.00 Dollars for
accrued but unused vacation, . . . together with
continued benefit coverage . . . [and] outplacement
assistance, release, remise and forever discharge
Philip Morris Companies, Inc. . . . of and from all and
in all manner of presently existing actions, causes of
action, suits, debts, claims and demands whatsoever in
law or equity arising from my employment with the
Company . . . .
Adams, 67 F.3d at 582 (alterations in original).

-16-

knowing and voluntary.  Specifically, the waiver used clear
language, Russell was given seven days -- two more days than the
employee in <u>Adams</u> was given -- to consider the waiver, Russell
was advised to consult an attorney, and he also received a more
generous severance package than he would have received had he not
signed the waiver.

    B.  <u>Scope of release</u>

    Under the Agreement, Russell released the defendants from
all ERISA claims, "whether now known or unknown, suspected or
unsuspected and whether or not concealed or hidden, fixed or
contingent" that had "arisen on or before" June 19, 2007, the
date that the Agreement became effective.  <u>See</u> Agreement ¶ 2(a).

    "[R]eleases are to be treated as contracts, and general
contract principles apply."  <u>Wolcott v. Ginsburg</u>, 697 F. Supp.
540, 544 (D.D.C. 1988); <u>see also</u> <u>Anzueto</u>, 357 F. Supp. 2d at 30
(stating that a contract purporting to waive a plaintiff's right
to pursue Title VII claims is analyzed as an ordinary contract).
In the Agreement, the parties specified that the Agreement "will
be construed as a whole in accordance with its fair meaning and
in accordance with the internal laws of the State of Michigan."
Agreement ¶ 10.  Neither party contests the validity of the
choice of law provision.  Furthermore, "[u]nder American law,
contractual choice-of-law provisions are usually honored."
<u>Milanovich v. Costa Crociere, S.p.A.</u>, 954 F.2d 763, 767 (D.C.

Cir. 1992).  Thus, the Agreement will be construed under Michigan law.

Under Michigan law, a court interpreting a contract "is to discern the parties' intent by reading the contract as a whole." Haring Charter Twp. v. City of Cadillac, 811 N.W.2d 74, 81 (Mich. Ct. App. 2010); see also Greenville Lafayette, LLC v. Elgin State Bank, 818 N.W.2d 460, 464 (Mich. Ct. App. 2012) ("The goal of contract interpretation is to read the document as a whole and apply the plain language used in order to honor the intent of the parties.").  "[A]n unambiguous contract must be enforced as written unless it violates the law, is contrary to public policy, or is unenforceable under traditional contract defenses." Majestic Golf, L.L.C. v. Lake Walden Country Club, Inc., 823 N.W.2d 610, 621 (Mich. Ct. App. 2012).  "A contract is unambiguous, even if inartfully worded or clumsily arranged, when it fairly admits of but one interpretation."  McCoig Materials, LLC v. Galui Constr., Inc., 818 N.W.2d 410, 416 (Mich. Ct. App. 2012).  "[T]he failure to define a contractual term does not render a contract ambiguous."  Wells Fargo Bank, NA v. Cherryland Mall Ltd. P'ship, 812 N.W.2d 799, 809 (Mich. Ct. App. 2011); Haring, 811 N.W.2d at 81 ("Terms are ambiguous *only if* they cannot possibly be read together in harmony.").  "Rather, if a term is not defined in a contract, [courts] interpret such term in accordance with its commonly used meaning."  Wells Fargo Bank,

-18-

812 N.W.2d at 809 (internal quotation marks omitted).  "Every word, phrase, and clause in a contract must be given effect, and contract interpretation that would render any part of the contract surplusage or nugatory must be avoided."  McCoiq Materials, 818 N.W.2d at 416.

1. Meaning of "arisen"

The parties dispute when Russell's ERISA claims "arose" within the meaning of the Agreement.  The defendants argue that the "logical reading" of the Agreement is that Russell released any claim, known or unknown, that was available as a matter of law as of June 19, 2007 even if the injury from the legal violation occurred after that date.  Defs.' Suppl. Mem. in Supp. of Their Mot. to Dismiss at 2.  Under the defendants' interpretation, Russell released the claims pled in his amended complaint because he alleges that the defendants violated their fiduciary duties by making false and misleading statements as early as April 26, 2007.  Russell counters that his ERISA claims arose when the ERISA statute of limitations began to run for each claim.  Pl.'s Opp'n to Defs.' Suppl. Mem. in Supp. of Their Mot. to Dismiss at 1-2.  He argues that the statute of limitations, 29 U.S.C. § 1113, began to run when he had actual knowledge of the ERISA breach or violation.[9]  Id. at 2.  Thus, he concludes that

---

[9] Under 29 U.S.C. § 1113(a)(2), ERISA actions must be commenced within "three years after the earliest date on which

the earliest his claims could have arisen was January 14, 2008 when the price of Harman stock dropped from $68.97 per share to $43.00 per share and Russell "first could have learned of the Company's change in guidance for fiscal year 2008." Id. at 3-4.

   The Agreement does not define "arisen." While both parties' interpretations of "arisen" comport with its commonly used meanings,[10] the Agreement allows only the defendants' interpretation of "arisen." In the Agreement, Russell released any claim of any kind "whether now known or unknown, suspected or unsuspected and whether or not concealed or hidden, fixed or contingent." Agreement ¶ 2(a). Russell contends that a claim has not arisen within the meaning of the Agreement until he had actual knowledge of the breach or violation. However, Russell's interpretation of "arisen" would render nugatory the portion of the contract that purports to release "unknown," "unsuspected," and "contingent" claims of any kind. Because, the defendants' interpretation of the contract is in line with a common use of "arisen" and is the logical proffered interpretation of "arisen"

_____

the plaintiff had actual knowledge of the breach or violation."
29 U.S.C. § 1113(a)(2).

   [10] Black's Law Dictionary defines "arise" as: "1. To originate; to stem (from)"; "2. To result (from)"; "3. To emerge in one's consciousness; to come to one's attention"; "4. (Of a court) to adjourn; to suspend sitting." Black's Law Dictionary (9th ed. 2009).

in context, Russell's claims that were available as a matter of law as of June 19, 2007, whether known or unknown, were released.

> 2.   When a breach of a fiduciary duty cause of action under ERISA is available as a matter of law

Russell's amended complaint alleges that the defendants breached their ERISA fiduciary duties of loyalty and prudence in part by failing to "convey complete and accurate information material to the circumstances of Participants and beneficiaries." Am. Compl. ¶ 166(c).  The duty of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -- (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]"  29 U.S.C. § 1104(a)(1).  The duty of loyalty "includes a duty to disclose material information . . . and deceptive conduct, such as lying, is clearly inconsistent with the duty of loyalty owed by an ERISA fiduciary."  Int'l Bhd. of Painters & Allied Trades Union & Indus. Pension Fund v. Duval, 925 F. Supp. 815, 821 (D.D.C. 1996); see also Varity Corp. v. Howe, 516 U.S. 489, 506 (1996).  The duty of prudence requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  For instance, a

-21-

fiduciary has a duty to make prudent investments.  <u>Fink v. Nat'l</u>
<u>Sav. & Trust Co.</u>, 772 F.2d 951, 955 (D.C. Cir. 1985).  Russell
claims that the defendants violated these fiduciary duties by
making materially false statements regarding the MyGiG radios,
PNDs, and Harman's overall financial health, and by allowing
participants in the Plan to continue to invest in Harman common
stock despite knowing or recklessly disregarding Harman's
declining financial position.

A breach of fiduciary duty claim is available when a
fiduciary completes the action that violates one of the duties
that ERISA requires.  "[A] plaintiff need not suffer harm (i.e.,
be denied pension benefits) before he becomes entitled to bring
an action under 29 U.S.C. § 1104(a)."  <u>Larson v. Northrop Corp.</u>,
21 F.3d 1164, 1171 (D.C. Cir. 1994) (citing <u>Ziegler v. Conn. Gen.</u>
<u>Life Ins. Co.</u>, 916 F.2d 548, 551-52 (9th Cir. 1990)).  Thus, for
example, a claim based on a breach of duty of loyalty is
available when the fiduciary makes a material misrepresentation
and a claim based on a breach of duty of prudence is available
when the fiduciary makes the imprudent investment.  Russell
alleges that the defendants made false and misleading statements
to the Plan participants and made imprudent investments as early
as April 26, 2007.  Thus, Russell's ERISA claims were available
before June 19, 2007 and thus had "arisen" when Russell executed
the Agreement releasing his ERISA claims.  Accordingly, Russell

-22-

is contractually barred from bringing on his own behalf the ERISA claims alleged in his amended complaint.

## II.   CLAIMS BROUGHT ON BEHALF OF PLAN PARTICIPANTS

The defendants argue that Russell lacks standing under Article III of the U.S. Constitution to bring ERISA claims on behalf of Plan participants because these claims are not redressable.[11]

> To establish Article III standing, a party must establish three constitutional minima: (1) that the party has suffered an "injury in fact," (2) that the injury is "fairly traceable" to the challenged action of the defendant, and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

Grocery Mfrs. Ass'n v. EPA, 693 F.3d 169, 174 (D.C. Cir. 2012) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  "[A] plaintiff's injury is redressable when 'the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury' that is being alleged." Renal Physicians Ass'n v. Dep't of Health & Human Servs., 422 F. Supp. 2d 75, 82 (D.D.C. 2006) (quoting Fl. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663-64 (D.C. Cir. 1996)).

--------

[11] The defendants raise this standing argument for the first time in their reply brief.  Although courts generally "[do] not consider arguments raised for the first time in the reply," Gen. Carbon Co., a Div. of St. Mary's Carbon Co. v. OSHRC, 854 F.2d 1329, 1330 (D.C. Cir. 1988) (per curiam), "[b]ecause standing is a jurisdictional doctrine, . . . district court[s are], of course, obliged to consider the issue sua sponte," Catholic Soc. Serv. v. Shalala, 12 F.3d 1123, 1125 n.2 (D.C. Cir. 1994).

-23-

A pension benefit plan participant must have standing to bring a breach of fiduciary duty claim under ERISA on behalf of pension benefit plan participants.  See Evans v. Akers, 534 F.3d 65, 69-70 (1st Cir. 2008).  Generally, a plan participant's breach of fiduciary duty claim brought on behalf of defined contribution plan participants is redressable because any recovery under Section 502(a)(2) may eventually be received by the participant even though the recovery "might first go to the defined contribution plan rather than directly to the plaintiff." See Harris v. Amgen, Inc., 573 F.3d 728, 735-36 (9th Cir. 2009) (citing Evans, 534 F.3d at 74-75; In re Mut. Funds Inv. Litig., 529 F.3d 207, 210 (4th Cir. 2008); Harzewski v. Guidant Corp., 489 F.3d 799, 803 (7th Cir. 2007)).

Russell's amended complaint alleges that "[a]s a result of Defendants' fiduciary breaches, . . . the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of retirement savings and anticipated retirement income of the Plan's Participants."  Am. Compl. ¶ 5.  Russell brings his action to "seek[] losses to the Plan" caused by the defendants' fiduciary breaches.  Id. ¶ 4.  The defendants contend that under the Agreement, Russell "relinquish[ed] his right to recover 'damages, judgments, orders, and liabilities of whatever kind in law or equity.'"  Defs.' Reply Respecting Their Suppl. Mem. in Supp. of Their Mot. to Dismiss at 7 (quoting Agreement ¶ 2(a)).

-24-

The defendants further contend that because the release prohibits
Russell "from obtaining the personal, individual benefit" of any
recovery for his ERISA claims, he lacks standing to bring any
claims on behalf of Plan participants because he released his
right to any recovery even if his plan claims are successful.
See Defs.' Reply Br. in Supp. of Defs.' Mot. to Dismiss the Am.
Class Action Compl. at 21.  Russell does not dispute this
interpretation.  Moreover, the plain language of the contract
supports this broad interpretation.  See Agreement ¶ 2(a)
(stating that Russell "releases and forever discharges" the
defendants from all "damages, judgments, orders and liabilities
of whatever kind or nature in law, equity or otherwise").  Thus,
Russell waived his right to recover any losses that may accrue as
a result of his suit.  Because Russell waived his right to
recover relief from the defendants, he lacks standing to bring
claims on behalf of Plan participants because the court cannot
grant Russell any relief to redress the alleged injuries.

CONCLUSION

Russell released the ERISA claims alleged in his amended
complaint brought in an individual capacity and lacks Article III
standing to bring ERISA claims on behalf of Plan participants.
Accordingly, the defendants' motion to dismiss, treated as a
motion for summary judgment, will be granted.  A final Order
accompanies this Memorandum Opinion.

-25-

SIGNED this 22nd day of May, 2013.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge